Kelley *v.* Earle et al.

338

Argued January 29, 1937. Before KEPHART, C. J., SCHAFFER, MAXEY, DREW, LINN, STERN and BARNES, JJ.

*John P. Connelly,* with him *F. Gilman Spencer,* for plaintiff.

*Charles J. Margiotti,* Attorney General, and *Grover C. Ladner,* Deputy Attorney General, for defendants.

*James A. Montgomery, Jr.,* of *Pepper, Bodine, Stokes & Schoch,* for intervenor.

*Albert Smith Faught,* amicus curiæ.

OPINION BY MR. CHIEF JUSTICE KEPHART, February 4, 1937:

The Attorney General petitioned this Court to open the decree in and rehear the case of *Kelley v. Earle, et al,* 320 Pa. 449, wherein an injunction was granted. The first hearing was on original jurisdiction to restrain the General State Authority, a corporation organized under the provisions of the Act of June 28, 1935, P. L. 452, from entering into a proposed agreement of lease with the State under that Act and from generally carrying into effect the provisions of the Act. When the injunction was granted, the bills were retained in this court. Petitioner, to sustain the application for rehearing, has filed as part of the record a stipulation embodying new and additional facts so that the questions raised may be "re-examined in the light of these additional facts and circumstances."

The facts on which the original petition was based are detailed at length in the former opinion and need not be repeated in detail. They may be summarized briefly. The Act of 1935, P. L. 452, creates a corporation known as the General State Authority, designated as a "public corporation" and "governmental instrumentality"; it is composed of the Governor, State Treasurer, and other State officers. The express purpose of its creation is for the construction of permanent public works and improvements, such as sewers, water works, public buildings, airports, highways, etc., while the incidental purpose is to benefit the people of this Commonwealth by alleviating unemployment. To finance these projects it is vested with the power to borrow money and make necessary contracts, subject to the limitation that it can not pledge the credit of the State. It may acquire real and personal property by purchase, eminent domain or lease from the State Department of Property and Supplies, and may lease the completed projects to the State, or any agency or department thereof, with the approval of the Governor. The agreements and leases set forth were the typical documents which were to carry into effect the provisions of the Act. The Commonwealth was to convey land to the Authority for a nominal consideration; the Authority was to construct a complete water works system to be rented to the State Department of Welfare for a term not exceeding 30 years at varying annual rentals. At the expiration of the term and upon payment of the stipulated rental title to the ground and project was to be conveyed to the Commonwealth free and clear of encumbrances.

When the case was first heard, the constitutionality of the Act was considered solely with reference to the stipulated facts before us. The main objection came from the alleged violation of Section 4 of Article IX of the Constitution, which reads: "No debts shall be created by or on behalf of the State, except to supply

casual deficiencies . . . ." The complainants contended that the obligation of the Commonwealth in the agreement of lease created a debt, which could not be met from current revenues, and was therefore an invasion of the constitutional limitation; further, that the agreement in effect was the purchase of a capital asset by installments, the aggregate of which exceeded the revenues on hand; that it was a continuing obligation beyond the present biennium and therefore an illegal undertaking in violation of this Article. To emphasize that the transaction was a debt, it was urged that the State grants its land to the Authority [its creature] without cost, that the Authority creates a bond issue against it, and that the holders of the bonds on default may take the land. Such compulsion to subject the lands to payment of the bonds could only accompany a debt. The same arguments are again set forth to the amended record.

The new facts contained in the petition for rehearing and reargument are so vital and important that we may, without hesitation, state that a new cause of action is presented. These so modify the original record that the objections heretofore made, no longer have factual grounds to support them.

The additional facts contained in the amended record, which have a material bearing on the question of the constitutionality of the proposed lease will now be stated. A stipulation has been filed exempting the land of the State or the Authority from execution. For this purpose a protective clause will be inserted in the loan agreement, lease and deed of trust.[1]

---

[1] "Section 24: In case a receiver for the Authority or the Project is appointed under the terms of this Agreement or of the Indenture provided for in this Agreement, or under the terms of Act No. 190, the power of such receiver shall be limited to the operation and maintenance of the Project or of the facilities of the Authority and he shall have no power to sell, assign, mortgage or otherwise dispose of any assets, of whatever kind or character, be-

It appears that the Commonwealth is compelled to pay from 10 to 50% more under its present leasing system than it would be required to pay under the proposed new leases and in no case will the annual rent in the latter exceed 5% of the capital cost of the projects. The total of the projects for which applications have been filed, amounts to $60,000,000, of which the Federal Authority will furnish, without reimbursement, 45%. The facts show that the Commonwealth has ample resources to pay the annual obligations of rent which will be called for if the whole of the $60,000,000 is used for the purposes mentioned in the Act. If all the projects are approved the total annual rent therefor will be $1,980,000 or $3,960,000 for each biennium. There are not only sufficient revenues available for such purposes, but the Legislature will be asked to appropriate said sum as an ordinary and current expense of Government, and hence preferred over other expenditures exclusive of debt service and sinking fund requirements.

Many of the improvements include needed additions to State medical, surgical and mental hospitals, penal and correctional institutions which are already inadequate to meet the demands laid upon them and are grossly overcrowded, with a waiting list running into thousands. Each of these institutions receives income from the several counties of the Commonwealth, and these counties have paid to the institutions for the patients sent there by them, a total amount, as will be seen by the table[2] on next page, of $7,289,030.42 for the period from June 1, 1935, to November 30, 1936. This income will be increased by the new additions and all will be available for the uses of the institutions to be benefited, including the charges to be paid under

longing to the Authority, nor any land upon which the project is erected which belongs to and was made available by the Commonwealth."

## ²BUREAU OF INSTITUTIONAL COLLECTIONS DEPARTMENT OF REVENUE

Collections Received by the Bureau of Institutions from Counties and Poor Districts from June 1, 1935, to November 30, 1936, Inclusive.

| | June 1, 1935 to May 31, 1936 | June 1, 1936 to Nov. 30, 1936 | Total Amount Collected from June 1, 1935 to Nov. 30, 1936 |
|---|---|---|---|
| **MENTAL HOSPITALS** | | | |
| Allentown State Hospital | $244,514.91 | $113,758.07 | $358,272.98 |
| Danville State Hospital | 259,238.33 | 121,265.56 | 380,503.89 |
| Fairview State Hospital | 236,141.77 | 112,260.44 | 348,402.21 |
| Harrisburg State Hospital | 272,664.88 | 139,426.84 | 412,091.72 |
| Norristown State Hospital | 589,960.11 | 156,949.99 | 746,910.10 |
| Torrance State Hospital | 281,648.81 | 215,415.27 | 447,064.08 |
| Warren State Hospital | 254,709.51 | 151,966.30 | 406,675.81 |
| Wernersville State Hospital | 239,178.74 | 96,078.17 | 335,256.91 |
| | $2,328,057.06 | $1,107,120.64 | $3,435,177.70 |
| **FEEBLE MINDED AND EPILEPTIC INSTITUTIONS** | | | |
| Laurelton State Village, Laurelton | $30,056.20 | $11,615.77 | $41,671.97 |
| Pennhurst State School, Pennhurst | 78,402.60 | 25,847.49 | 104,250.09 |
| Polk State School, Polk | 114,323.17 | 60,896.03 | 175,219.20 |
| Selinsgrove State Colony for Epileptics, Selinsgrove | 17,026.78 | 8,081.10 | 25,107.88 |
| | $239,808.75 | $106,440.39 | $346,249.14 |
| **PENAL AND CORRECTIONAL INSTITUTIONS** | | | |
| Eastern Penitentiary | $903,304.22 | $300,962.13 | $1,204,266.35 |
| Western Penitentiary | 526,989.18 | 387,882.20 | 914,871.38 |
| Pennsylvania Industrial School, Huntingdon | 533,470.05 | 223,517.69 | 756,987.74 |
| Pa. Training School, Morganza | 229,339.07 | 182,032.15 | 411,371.22 |
| Pa. Industrial Home for Women, Muncy | 174,120.97 | 45,985.92 | 220,106.89 |
| | $2,367,223.49 | $1,140,380.09 | $3,507,603.58 |

the agreements. In the particular project in question, the Selinsgrove State Colony for Epileptics, the receipts from the institution for the same period were $25,107.88. The construction of the sorely needed projects would result in a great saving to the State, especially in respect to rentals now paid annually, and would decrease substantially the otherwise necessary appropriations for unemployment relief during the current biennium.

The new leases will be "straight" leases to the Commonwealth and at the end of the 30 year period, the title and ownership of the project and ground will be in the General State Authority. There is no provision for reconveyance to the State. It is in the light of these new facts and circumstances that this court will now consider the case.

As a preliminary question our authority to reopen the case was determined in *Ladner v. Siegel,* 298 Pa. 487, where it was contended that a court of equity had no power to open and modify a decree after the term in which it was rendered, except by a bill of review. We held that there were no term times in equity, and common law rules as to term time do not apply. The facts of the instant case bring it squarely within the rules expressed on page 497 of *Ladner v. Siegel,* supra. We there held that no vested right could arise from an injunction which "due process" protected from future change, since an injunction does no more than protect property rights under the then existing facts and law and is necessarily subject to modification because of changes in either or both.

In considering the question of constitutionality, due regard must be had to the Commonwealth's position, the projects to be undertaken, the character of the contract and the parties with whom it is made. To enforce a harsh, literal interpretation of the Constitution when considering the legality of the leases of the projects herein mentioned, which are essential to the life of the State and the comfort, health or security

of its people, a construction opposed to all business concepts, would violate all rules of interpretation and cause loss of the respect necessary to the life of that document. While it is the duty of the courts to uphold the Constitution, it is likewise their duty not to declare an act unconstitutional unless it is imperatively necessary to do so. We must reach the solution not through a forced, strained, or unnatural construction, but one in keeping with the end to be obtained in the light of necessary government expenses and with the constitutional interdiction before us. Happily the ground has been broken for us.

Many of the projects with which these contracts and leases are concerned are self-liquidating projects sustainable under the case of *Tranter v. Allegheny County Authority*, 316 Pa. 65. When the annual rent is compared with the revenues received by these institutions, which are the real basis of liability for rent if a default occurs,[3] there is no question but that they are self-liquidating. A self-liquidating project may be defined as one wherein the revenues received are sufficient to pay the bonded debt and interest charges over a period of time. The source of the receipt is not important. Here we have a facility leased to the State which operates and maintains it and pays certain rental therefor. The State in turn receives from the several counties of the Commonwealth per diem compensation for all indigent patients who are sent to the institution from the counties. In very many instances the State receives compensation on a per diem basis direct from the patients or their relatives or the estates of both. The source of the counties' revenue is immaterial; it

---

[3] Par. (f) ". . . the Authority shall receive payment of the rentals therein specified for the full term of the Lease, such payments to constitute a first charge on any funds which may be made available for any purposes in connection with the maintenance or operation of the State Colony for Epileptics, to which institution this Project constitutes an addition."

does not come from the State. The enlargement of existing facilities by new projects will cause an increase in the number of patients or inmates and bring forward additional revenue from the sources mentioned. The table submitted as part of the record shows conclusively that the present and future revenues of the State are and will be sufficient to take care of the liquidating charges and leave a balance over; that these are always available under paragraph (f) of the stipulated facts quoted above.[4] In *Tranter v. Allegheny County Authority,* supra, we stated at page 85:

"We are here dealing with the construction of a purely public self-liquidating project. The denial of power to incur liability on the credit of the [State] . . . is notice to the prospective purchasers of the bonds that their security and their only source of payment will be in the revenues [rents] derived from users of the improved . . . facilities . . . The bondholders cannot call upon the public treasuries to contribute; no [State] . . . property can be taken for the debt, because the bondholders have agreed to look to a special fund for payment to be raised in the manner provided."

We could well rest the present case on this conclusion, but as there are a number of projects enumerated in the Act, the constitutionality of these endeavors must be considered in the light of the objections to the lease.

It was conceded at the argument that contracts or leases to meet recurrent needs the obligation of which is to be met by the Commonwealth from current revenues extending beyond the biennium are not within the constitutional limitation. This court, through Mr. Jus-

---

[4] Par. (f). ". . . the Authority shall receive payment of the rentals therein specified for the full term of the Lease, such payments to constitute a first charge on any funds which may be made available for any purposes in connection with the maintenance or operation of the State Colony for Epileptics, to which institution this Project constitutes an addition."

tice DREW, so expressed itself in the former decision on this case: *Kelley v. Earle,* supra, at page 457. See also *Scranton Elec. Co. v. Old Forge Boro.,* 309 Pa. 73; *Wade v. Oakmont Boro.,* 165 Pa. 479; *Metropolitan Elec. Co. v. City of Reading,* 175 Pa. 107. As far as municipalities are concerned if such obligations are met from current revenues from year to year, they cannot be considered debts in the constitutional sense, even though the aggregate or sum total of all payments should exceed the constitutional limitation. See *Wade v. Oakmont Boro.,* supra. The same rule applies to the State. The amended record shows revenues on hand sufficient to meet rent charges during the biennium, and other similar demands will be taken care of in appropriations by the legislature. The effect of the above decisions is unquestionably controlling in the matter before us. The court has held that these contracts extending over a long period of time were not to be considered in their aggregate so as to violate the constitutional inhibition. The provision of the Constitution referring to the creation of a debt by the State is no stronger than the provision referring to the creation of a debt by municipalities. Having decided that this type of a contract was not a "debt" within the meaning of one section of the Constitution, for the same reason it should not be held a "debt" within the meaning of the other section which relates to the State.

The Commonwealth is at present renting a number of structures throughout the State, paying at times high rental therefor. Many of these leases are for long terms and must be so, otherwise they could not be secured. Their validity has been sustained by our cases. The leased properties are essential to the conduct of governmental business and the comfort, health and security of our people. When the case was first here the difference between such leases and the one then under consideration was that at the end of a definite period, upon compliance with the contract, the property leased

was to be deeded to the Commonwealth. This the court held was a sale not a lease. We now have a very different situation. The instrument before us is a straight lease for a recurring necessity. The land leased is not deeded to the Commonwealth; it is still held by the Authority, an independent public corporation. In the statement submitted as part of the record it appears that the rentals under the present plan will be anywhere from 10% to 50% less than those which the State is now required to pay for the same facilities. While the constitutional interdiction lays a heavy hand on waste and improvident expenditures, that very condition, an arbitrarily hopeless one, would be created through an interpretation such as we are now asked to place on it. The framers certainly did not intend this to happen, nor did they intend to deprive the State of "the benefit that may accrue from favorable contracts for a term of years for supplying what must certainly be had, and must otherwise be provided for annually at, perhaps, additional expense and inconvenience. Any expense that recurs with regularity and certainty and is necessary for [its] existence . . . or for the health, comfort and perhaps convenience of the inhabitants may well be called an ordinary expense": *Brown v. City of Corry*, 175 Pa. 528. What condition is more recurring than the perennial obligation of this Commonwealth to care for helpless, indigent, epileptic, feeble-minded, blind, tubercular and other patients or inmates that overflow the institutions named in the Act? Wherein are the objects to be attained by the Act by the building program a new burden? These conditions are with us always and recur with an oppressive regularity.

The Commonwealth has ·vast resources beyond those of a municipality, which is financially restricted and limited by the laws of its creation. Obviously the State, the sovereign power, should not be held to a more rigorous rule in its expenditures than is applied to one of its creatures, a municipality, which may make con-

tracts extending over a period of years for recurrent needs without violating the Constitution: *Scranton Elec. Co. v. Old Forge,* supra.

The words "debt and indebtedness [as used in the Constitution]ʹ . . . are not used in any technical way, but in the broad general meaning of all contractual obligations to pay in the future for consideration received in the present": *Keller v. Scranton,* 200 Pa. 130. Here a capital asset, as it has been termed, is not received in the present, though payments on the lease are to be made from time to time. What the State is undertaking is not the outright purchase of an improvement, but a lease of an improvement on the payment of a moderate annual rental. The State pays as it goes and receives consideration for each payment as it falls due. There is no purchasing here on the credit of the future; for each payment made there is a present benefit to the State. No title under the leases or agreements passes to the Commonwealth; it remains with the Authority.

Under the contract between the Authority and the Federal government the revenue of the Authority from the property leased (the rent) is pledged for its debt *as is any fund available for any purpose* in connection with the operation and maintenance of the particular institution. If there is a default in the payments on the bonds, the trustee for the bondholders may assume control, operate the property and collect the revenues from the improvements for the liquidation of the debt. When it is paid, the power of the trustee is at an end. This was true also in *Tranter v. Allegheny County Authority,* supra, where the court, through Mr. Justice LINN, concludes: "This difference between a pledge of property and a pledge of income has been said to distinguish a transaction which created a debt within the constitutional limitation from one creating a debt not within it."

But it is urged that the Commonwealth assumes the burden of operation, maintenance and repair. Similar

objections were made in *Tranter v. Allegheny County Authority,* supra, and rejected. The reasons there given are adequate. See also *California Toll Bridge Authority v. Kelly,* 218 Cal. 7. As noted previously it appears from the supplemental record that there are sufficient current revenues available and the legislature will appropriate therefrom adequate funds to take care of these expenses. In fact, as to this particular institution the public, through the counties, has been providing for its maintenance, operation and repair for many, many years. This, however, does not impose a continuing or other liability on the State.

To further evidence the fact that there is no general obligation on the State, the Attorney General has filed a stipulation wherein the Federal Emergency Public Works Administration expressly agrees that the bonds to be issued will confer no right on the holders of the bonds or the trustee to proceed or claim against the lands of the Commonwealth or the lands of the Authority. This very important qualification was not present in the former hearing and, if any further proof is necessary to emphasize the fact that the obligation under the lease and the lease itself is not a debt within the meaning of the Constitution, this addition not only strongly fortifies but supplies it.

It is urged, however, that default in the payment of rent will work a forfeiture of the lease. As stated, this is true, but the forfeiture does not impose any greater obligation on the State than is provided in the bonds or the deed of trust on which they are conditioned. Therein the power of the trustee is limited to taking charge of the institution and operating it. It may readily be seen that this provision, as in *Tranter v. Allegheny County Authority,* supra, is not sufficient to avoid the instrument on constitutional grounds.

It is urged that the transaction is in effect a purchase of capital assets by installments. To sustain this conclusion, of necessity we must hold the agreement a sale;

we have held the agreement is a lease and nothing more. If this were an outright purchase of property to be paid for in the future it would undoubtedly be within the constitutional objection, but it is not a purchase nor does it have the attributes of a purchase. The title to the property is in the lessor Authority, it may be subjected to defined uses and purposes by the trustee under the deed of trust; the Commonwealth, under the lease, cannot intermeddle with it if a default in the payment of rent exists. The fact that the proposed plan might be termed an evasion of the Constitution, would not condemn it unless such evasion was illegal. "It is never an illegal evasion to accomplish a desired result, lawful in itself, by discovering a legal way to do it": *Tranter v. Allegheny County Authority,* supra, at p. 84. The bonds of the Authority are to be paid out of its revenues. The credit of the State is not pledged or bargained away.

Much stress has been laid on the various cases that have heretofore been decided. But these cases are and were distinguished in *Tranter v. Allegheny County Authority,* supra, and need not be further discussed in this opinion. There is one outstanding factor which the additional facts present to us—the immunity of State property and the inability of creditors to compel payments beyond the sums available for current revenues—which differentiates this contract from the contracts involved in *McKinnon v. Mertz,* 225 Pa. 85; *Lesser v. Warren Boro.,* 237 Pa. 501; *Brown v. City of Corry,* supra. The credit of the Commonwealth as such is not behind these bonds.

Many additional challenges have been made to the constitutionality of the Authority Act. It is contended that it creates a special corporation in violation of Article III, Section 7, which reads that no law shall be passed "creating corporations or amending, reviving or extending the charters thereof." By the Act the designated members of the State Authority "are . . . created a body corporate and politic constituting a public

corporation and governmental instrumentality." It is empowered to sue and be sued, to adopt a corporate seal, hold property, make by-laws, appoint agents and have many other powers necessary for the carrying out of the purposes for its creation. The purpose of the constitutional provision was to remedy the abuse arising out of special charters and singular privileges which were granted by the legislature when incorporation was a matter controlled by special act. It was not intended, however, to limit the State in the creation of special corporations for governmental purposes.

While our research discloses no case squarely interpreting this Section as applying solely to private corporations, in the cases of *Commonwealth, to use, v. Philadelphia,* 193 Pa. 236, and *Commonwealth v. Emmers,* 221 Pa. 298, 313, this court intimated that the section is to be so restricted. An illustration of a public corporation created by the legislature as a governmental instrumentality is contained in *Tranter v. Allegheny County Authority,* supra, where the body is nominated as the County Authority. Obviously, from the very nature and purpose of these corporate bodies, created to assist the State in its essential operations, a distinction must be drawn from the larger class of private or quasi public corporations to which, and to which alone, the constitutional provision was clearly meant to apply. See also *Moers v. Reading,* 21 Pa. 188; *Board of Health v. Diamond Mills Paper Co.,* 51 Atl. 1019, 1020.

It is also contended that there is an unconstitutional delegation of legislative power, but nothing is shown to sustain this contention. The State Authority cannot make laws, nor can it levy or collect taxes, and it is specifically denied the power to create any indebtedness in the name of the State. Its broad functions are to arrange for the construction of designated types of public improvements, for their financing and for the retirement of the obligations thus incurred. These duties can hardly be termed purely legislative and to rest exclu-

sively in the legislature. See *Gima v. Hudson Coal Co.*, 310 Pa. 480, 485; see also *Lower Col. River Authority v. McCraw*, 83 S. W. (2d) 629, 636; *Matter of Suffolk Co. v. Water Power & Control Com.*, 269 N. Y. 158. There are many other governmental instrumentalities which have similar powers.

It is urged the title to the Act violates in three particulars Section 3 of Article III of the Constitution, known as the Single Title Provision. It is stated that the Act contains two separate subjects which are, first, the creation of the Authority and, second, the conferring of power upon the Department of Property and Supplies to convey without consideration, property to the Authority. We have had this Article and Section before us so often that it is scarcely necessary to discuss the subject at length: see *Booth & Flinn, Ltd., v. Miller*, 237 Pa. 297. See also *Reber's Petition*, 235 Pa. 622; *McGuire v. Philadelphia (No. 2)*, 245 Pa. 307; *Kelley v. Mayberry Township*, 154 Pa. 440; *Clearfield County v. Cameron Township Poor D.*, 135 Pa. 86; *Mallinger v. Pittsburgh*, 316 Pa. 257; *Commonwealth v. Miller*, 313 Pa. 140.

In *Commonwealth v. Liveright*, 308 Pa. 35, it was said: "Unless a substantive matter entirely disconnected with the named legislation, is included within the bill, the act will not be declared in violation of the Constitution as offending Section 3 of Article III." It is certainly germane to the creation of this public corporation for the purpose of constructing, improving and operating projects to provide in the same Act the manner in which it shall acquire the property whereby this is to be accomplished: *Commonwealth v. Snyder*, 279 Pa. 234, construing the title to the Administrative Code of 1923, provides ample authority for our present conclusion.

It is further objected that the purpose of the Act is not expressed with sufficient clarity in the title because of the indefinite meaning of the word "projects." Defi-

nitions from standard dictionaries are cited to show the variety and breadth of meaning which attaches to the word. The same objection might be made to any word in the title, which, torn from the context, would be found to have varying shades and degrees of meaning and utterly dissimilar connotations in its different senses of usage. The words of our language are extremely versatile. However, as the word "projects" appears in the title of the Act, its intended meaning is perfectly clear to any reader. During the past five years it has been a recognized designation for public works and improvements. The fact that dictionary definitions do not include its current and popular meaning is not decisive of its clarity, for it is well known that lexicographers are slow to recognize acquisitions to the national vocabulary. The words used in the title are to be given their common sense meaning *(Reber's Petition,* supra), and if this is done there can be no genuine confusion as to its purpose.

The most seriously urged objection to this title is that it fails to give notice of the fact that it imposes a financial burden upon the Commonwealth, and therefore upon the taxpayers, by providing for the payment of rentals by the State to the Authority at sums fixed by the latter, until its bonds issued upon the projects are retired. This argument is extremely specious. The title to the Act provides that the Authority shall have the power to lease its projects. It is true that it does not state to whom the projects shall be leased, but that is not necessary. Under the Act, Section 4(d), the Authority is empowered "to lease as lessor to the Commonwealth of Pennsylvania *and* any city, county, or other political subdivision, or any agency, department, or public body of the Commonwealth, any project at any time constructed by the Authority. . . ." This is a power conferred upon the Authority, not a positive duty imposed upon the Commonwealth or the subdivisions thereof. There is nothing in the Act that imposes any lia-

bility on the State with respect to the bonds. In fact, the Act provides otherwise: the Authority shall not have the power to pledge the credit of any of the lessee political bodies; its debts are not to be the debts of these bodies. In *Reber's Petition,* supra, the Act creating the county boards of viewers was attacked upon similar grounds. Cases cited in support of this constitutional objection relate to Acts which contained express provisions imposing financial obligations upon the Commonwealth or its subdivisions, which provisions were not referred to in the titles.

In Article III, Section 7, of the Constitution is found a prohibition against "granting to any corporation, association or individual any special or exclusive privilege or immunity. . . ." This section of our Constitution was held in *Commonwealth v. Emmers,* supra, not to apply to municipal corporations or agencies of the State. Cf: *Philadelphia v. Fox,* 64 Pa. 169.

Does it violate Section 17 of Article I of the Constitution, which provides: "No ex post facto law, nor any law impairing the obligation of contracts, or making irrevocable any grant of special privileges or immunities, shall be passed." It is the third clause of this section that is invoked. We have not passed upon the meaning of this constitutional provision. What is meant by "special privileges and immunities" is doubtful. In *State v. West Missouri Power Co.,* 313 Mo. 283, it was held the conferring of a franchise in perpetuity upon a public utility corporation was not a special privilege within its meaning unless the franchise conferred was exclusive. To the same effect is *City of Plattsmouth v. Nebraska Telephone Co.,* 80 Neb. 460, which is cited in *Old Colony Tr. Co. v. Omaha,* 230 U. S. 100.

It is not necessary, however, to determine in this case whether the legislature is bestowing upon this Authority any "special privileges or immunities" within the meaning of Article I, Section 17, or whether this section would apply to a governmental instrumentality such as

the Authority, for an examination of the Act of 1935, Section 14, discloses that whatever rights are conferred are not irrevocable within the meaning of the Constitution. In that section the legislature agrees with the United States or any Federal agency which contributes to the projects of the Authority that it "will not alter nor limit the rights and powers of the Authority *in any manner which would be inconsistent with the due performance of any agreement between the Authority and such federal agency,* and the Authority shall continue to have and may exercise all powers herein granted so long as the same shall be necessary or desirable for the carrying out of the purposes of the Act, and the purposes of the United States in the construction or improvement or enlargement of any project or such portion thereof." It is unnecessary to further discuss this feature as its effect is the same as that provided in Article I, Section 10 of the Federal Constitution.

With regard to the objections raised under Sections 1, 2 and 3 of Article IX, it may be generally stated that notwithstanding constitutional prohibitions against exemption of property from taxation except such as is named in the Constitution, the legislature may, nevertheless, exempt from taxation the bonds of governmental instrumentalities. Accordingly, these bonds have been held not to be such property as is contemplated by the constitutional prohibition: *In re Assessment of First Nat. Bank of Chickasha,* 58 Okla. 508, 160 P. 469; *Penick v. Foster,* 129 Ga. 217, 58 S. E. 773, 12 L. R. A. (N. S.) 1159; *Lower Col. River Authority v. McCraw,* supra; *Bates v. State Bridge Commission,* 109 W. Va. 186.

Having decided that the General State Authority Act and the undertakings in pursuance of it are constitutional, it follows that the bill of complaint must be dismissed.

Bill dismissed; costs to be paid by the Commonwealth.