**Consumers Education & Protective Association
v. City of Philadelphia**

*Samuel C. Stretton,* for plaintiffs.
*David Smith,* for defendant Paid.

*William R. Whompson,* for defendant City of Philadelphia.

SHEPPARD JR., *J.,* April 30, 2001—The plaintiffs oppose the building of two stadiums for Philadelphia sports teams. The defendants are the City of Philadelphia and the Philadelphia Authority for Industrial Development, the public authority that will own the stadiums. The plaintiffs seek a permanent injunction against building the stadiums and declaratory relief.

On February 16, 2001, the court conducted a trial on the merits. At the conclusion of the trial, the court granted the defendants' oral motion for a nonsuit. Pa. Rules C.P. 230.1 and 1512. On March 9, 2001, following oral argument, the court denied plaintiffs' motion for post-trial relief. Pa.R.C.P. 227.1. Plaintiffs now appeal. This opinion is submitted in support of these orders.

For the reasons set forth this court respectfully submits that its orders should be affirmed.

## FACTS

The relevant facts may be briefly summarized. Philadelphia City Council enacted a set of ordinances authorizing the construction of two stadiums: a football stadium for the Philadelphia Eagles and a baseball stadium for the Philadelphia Phillies. City council held several days of public hearings and passed the ordinances on December 20, 2000 by a vote of 15 to 2.

### I. *The $53 Million Shortage in Funding For the Stadiums*

The stadiums will cost more than a billion dollars. The city will provide $394 million of this amount. (2/16/01; N.T. 28-29.) The teams and the Commonwealth will pro-

vide most of the remaining funds. When city council passed the stadium ordinances, there was a $53 million shortage in funding for the stadiums and no record of the source of funds to make up the shortfall. (2/16/01; N.T. 31-32.) However, by ordinance, the $53 million must come from a source other than the city. (2/16/01; N.T. 31-32.) Plaintiffs Lance Haver and Robert Sklaroff assert that had they known how the defendants planned to pay the additional $53 million, they would have presented testimony about that issue at the public hearings on the stadium bills. (2/16/01; N.T. 32-33, 35-36.)

## II. *City Council's Approval of Four Leases For Each Stadium*

The city will provide most of its share of the stadium funding through a complex leasing arrangement. Ordinance no. 721-A authorizes the city to enter into a set of four leases for the Eagles stadium. Ordinance no. 722-A authorizes the city to enter into a set of four leases for the Phillies stadium. For each stadium, there is a ground lease, a prime lease, a leaseback and a team sublease. For purposes of plaintiffs' arguments, the terms of each of the four Eagle's leases are the same as the terms of the corresponding Phillies' leases. The parties to the leases are the city, PAID and the teams.

City council approved copies of the ground lease, prime lease and leaseback agreements for each stadium and attached them to the ordinances. City council did not approve copies of the actual team sublease agreements as part of the ordinances. Instead, city council approved two documents titled "Eagles lease and development agreement terms and conditions" and "Phillies lease and development agreement terms and conditions" (together, team sublease terms and conditions). Ordi-

nance 721-A, exhibit D; ordinance no. 722-A, exhibit D. The ordinances authorized the city to approve team subleases "conform[ing] in all material respects" to those terms and conditions. Ordinance 721-A, §8(a); ordinance 722-B, §8(a). The ordinances required the parties to file copies of the team subleases with city council, and required city council to act on the subleases within 30 days. Ordinance 721-A, §8(b); ordinance 722-B, §8(b). The ordinances authorized the city solicitor to insert additional terms in the team subleases consistent with the approved team sublease terms and conditions. Ordinance no. 721-A, §§6,8; ordinance no. 722-A, §§6,8. On February 1, 2001, city council approved the team subleases by resolution. (2/16/01; N.T. 20-21.)

### III. *The Terms of the Leases*

Under the ground leases, the city leases the land for the stadiums to PAID for 30 years. Ground lease §3.1. PAID's rent is a one-time payment equal to the amount necessary to reimburse the city's cost to acquire the land on which the teams will build the stadiums. Ground lease §4.1.

Under the prime leases, PAID leases the land back to the city for 30 years. Prime lease §3.1; team sublease terms & conditions at 7. PAID obtains financing for the stadiums by issuing bonds and the city pays rent equal to an amount sufficient to enable PAID to meet its obligations under the bonds and to pay off other indebtedness. Prime lease §4.1. At the end of the term of the leases, the city's leasehold interest reverts to PAID. Prime lease §5.1.

Under the leasebacks, the city leases the land back to PAID for a one-time rent payment of a dollar. Leaseback §4.1.

Under the team subleases, PAID leases the stadiums to the teams. Team sublease terms & conditions.

## IV. *The City's Rights and Obligations Under the Prime Lease*

The prime lease provides as follows:

"The rent shall be payable only out of the current revenues of the city and the city agrees to provide for payment of the rent and include the same in the city's annual operating budget for each fiscal year of the city. If the current revenues of the city are insufficient to pay the rent in any fiscal year as the same becomes due and payable, the city shall include amounts not so paid in the city's operating budget for the ensuing fiscal year and shall produce sufficient current revenues to pay in the ensuing fiscal year such balance due for the preceding fiscal year in addition to the amount of rent due for the ensuing fiscal year." Prime lease §4.2(a).

The city's obligation to pay rent is unconditional. Prime lease §4.5. The city's failure to pay rent under the prime lease constitutes a default. Prime lease §4.2(c).

PAID may assign its right to receive rent under the prime lease to a trustee for the bondholders, who may then exercise all rights granted to PAID under the prime lease. Prime lease §4.3. In no circumstance may PAID accelerate the city's obligation to pay any or all of the rent under the prime lease or terminate the prime lease. Prime lease §§4.1(d) and 15.2(c).

## V. *PAID's Bonds*

All bonds that PAID issues to finance the stadiums are subject to the city's approval, and the city may grant or withhold that approval at its sole discretion, prime

lease §4.6. The city has authorized PAID to issue $304 million in bonds for the stadiums. (2/16/01; N.T. 28-29.) The city will pay an additional $90 million for a total contribution of $394 million toward the stadiums. (2/16/01; N.T. 28-29.)

The 10-year average annual assessed value of taxable realty in the city as of June 30, 2000 was approximately $9 billion. (2/16/01; N.T. 29-30.)

## DISCUSSION

The plaintiffs' main arguments are: (1) the city's obligation under the stadium leases create debt in excess of Philadelphia's constitutional debt restriction, Pa.Const. Art. IX, §12, (2) PAID has pledged the city's credit or taxing power in violation of the Economic Development Financing Law, 73 P.S. §376(c), and (3) the procedure by which city council approved the ordinances violated Philadelphia's Home Rule Charter, 351 Pa.Code §§2.2-200, 2.2-201, 2.2-309 and 8.8-200(3). The court entered a compulsory nonsuit because, at the close of the plaintiffs' case, it was clear that the plaintiffs had failed to establish a right to relief. Pa.R.C.P. 230.1 (standard for nonsuit), Pa.R.C.P. 2232(d) (nonsuit in favor of multiple defendants); Pa.R.C.P. 1512 (standard for entering a nonsuit is the same at equity as at law) *Atlantic Richfield Company v. Razumic,* 480 Pa. 366, 378, 390 A.2d 736, 744 (1978).

### I. *The Prime Lease Does Not Create a Debt Under Article IX of the Pennsylvania Constitution*

The plaintiffs argue that the city's obligations under section 4.2(a) of the prime leases violate the Philadelphia debt restriction provision of the Pennsylvania Constitution. Our Constitution provides that "the debt of

the City of Philadelphia may be increased in such amount that the total debt of said city shall not exceed 13.5 percent of the average of the annual assessed valuations of the taxable realty therein, during the 10 years immediately preceding the year in which such increase is made, *but said city shall not increase its indebtedness to an amount exceeding 3 percent upon such average assessed valuation of realty, without the consent of the electors thereof at a public election held in such manner as shall be provided by law."* Pa.Const. Art. IX, §12. (emphasis added)[1]

The 10 year average annual assessed value of taxable realty is about $9 billion. Three percent of that value is $270 million. Here, the city's rental payments must be sufficient to retire $304 million in PAID's debt. Therefore, if the city's rental payments are deemed indebtedness under Article IX, the city's contribution will exceed the constitutional 3 percent maximum. (2/16/01; N.T. 29-30.)

Instead of submitting the leases to the voters for approval, the city approved the leases by city council ordinance. The plaintiffs contend that the city's obligations are a debt. Calling the scheme a lease is a sham, say the plaintiffs, for the city is acquiring a capital asset and the rents are really debt service. The plaintiffs would have this court apply the duck test[2]—a test of which this court is quite fond. (2/16/01; N.T. 86.) Unfortunately for the plaintiffs, however, 60 years of case law

---

1. This restriction applies only to Philadelphia. The Constitution also imposes debt restrictions on the Commonwealth, Pa.Const. Art. VII, §7, and requires the legislature to impose debt limits on local governments other than Philadelphia, Pa.Const. Art. IX, §10.

2. "[I]f it looks like a duck, walks like a duck, and sounds like a duck, it is a duck," *People ex rel. Lokyer v. Pacific Gaming Technologies,* 98 Cal.Rptr.2d 400, 401 and n.1 (Ct. App. 2000).

on this issue have divorced legal and biological taxonomy. In the law of authority-financed public works, there are no more ducks. The city's obligations under the stadium leases are not a debt as the Pennsylvania Constitution defines that term. *Conrad v. Pittsburgh,* 421 Pa. 492, 500, 218 A.2d 906, 910-12 (1966).

### A. A Brief History of Constitutional Debt Restrictions and the Establishment of Public Authorities to Circumvent Those Restrictions

After certain financial embarrassments of the 19th century, most states adopted constitutional restrictions on government debt. G. Robert Morris, Jr., *Evading Debt Limitations With Public Building Authorities: The Costly Subversion of State Constitutions,* 68 Yale L.J., 234 (1958). These restrictions had the laudable goal of curbing fiscal irresponsibility. *Id.*

In the 20th century, however, publicly-financed public works became a matter of public policy for governments at all levels. *Id.* at 235. Constitutional debt restrictions got in the way of the equally laudable goal of publicly financing schools, utilities, mass transit systems and roads. *Id.* at 234. To support public works projects without violating state constitutions, governments enacted legislation enabling the creation of public authorities. *Id.* A public authority is typically a separate corporation that finances public works by borrowing from private lenders. *Id.* at 236. The authority earns revenue to pay off the debt by charging fees to the individual users of the authority's project, by charging rent or service fees to the state or local government that sponsors the project, or by doing both. *Id.* at 239-40. After paying off the debt, an authority often conveys the project to the sponsoring government. An ex-

ample of legislation enabling the creation of public authorities is the Economic Development Financing Law, 73 P.S. §371 et seq., under which the city established PAID.

Given that the very purpose of the authority device is to evade constitutional debt restrictions, there have been many legal challenges to arrangements between governments and authorities. See Morris, *supra*. Generally, those challenges argue that the authority's debt is really the government's debt, and that the debt exceeds the amount allowed under that government's constitution. *Id.* The Pennsylvania Supreme Court has rejected constitutional challenges to authority-financed construction and operation of schools, *Greenhalgh v. Woolworth,* 361 Pa. 543, 64 A.2d 659 (1949) and *Detweiler v. Hatfield Borough School District,* 376 Pa. 555, 104 A.2d 110 (1954), utilities, *Graham v. Philadelphia,* 334 Pa. 513, 6 A.2d 78 (1939), roads, *Tranter v. Allegheny County Authority,* 316 Pa. 65, 173 A. 289 (1934), housing, *Johnson v. Pennsylvania Housing Finance Agency,* 453 Pa. 329, 309 A.2d 528 (1973), and sports stadiums, *Conrad v. Pittsburgh,* 421 Pa. 492, 218 A.2d 906 (1966).

## B. The Pennsylvania Supreme Court Has Considered the Meaning of "Debt" for the Purpose of Constitutional Debt Restrictions

Courts in Pennsylvania, and throughout the country for that matter, have struggled to define "debt" for the purposes of constitutional debt restrictions. Essentially, a debt is a promise to make a future payment for a present consideration. *Kelley v. Earle,* 320 Pa. 449, 456, 182 A. 501, 504 (1936) (*Kelley I*). A promise to make a present payment for a present consideration—a pay-as-

you-go obligation—is not a debt. *Kelley v. Earle,* 325 Pa. 337, 349 190 A. 140,146 (1937) (*Kelley II*). In *Tranter v. Allegheny County Auth.,* 316 Pa. 65, 173 A. 289 (1934), the Pennsylvania Supreme Court held that an act enabling a public authority to build and operate roads did not violate constitutional debt restrictions. Under the act the authority issued bonds to finance the projects, built and operated the projects, charged user fees and pledged the fees to retire the debt. The *Tranter* plaintiffs argued that the authority's debt was the county's debt and that the debt exceed constitutional debt restrictions. The court held that an obligation cannot be a "debt of the county, unless it is a debt which the county has agreed to pay or can be required to pay." *Tranter,* at 84, 173 A. at 297. Because the road project was "self-liquidating"—the only source of payment for the authority's bonds was the revenues from the users of the project—it was not a debt of the county. *Id.*

The projects in *Tranter* are admittedly distinguishable from Philadelphia's stadium project in that the revenue that PAID will use to retire its bonds does not come directly from the stadium users, but instead from the city. In *Kelley v. Earle,* the Pennsylvania Supreme Court determined that this distinction is not controlling, and held that a leasing arrangement between the Commonwealth and the General State Authority did not violate constitutional debt restrictions. *Kelley II,* 325 Pa. at 340, 190 A. at 140. Under that arrangement, the Commonwealth conveyed land to the authority for nominal consideration. The authority obtained financing for the projects—which included hospitals—by issuing 30-year bonds, and the authority built the projects. The authority leased the projects to the Commonwealth for a 30-year term with varying rental payments that were calculated to retire the debt. The Commonwealth in turn re-

ceived payments from individual patients and from counties that sent indigent patients to the hospitals. The evidence showed that the patient payments plus the county referral payments would exceed the Commonwealth's rent payments.

Unlike the projects in *Tranter,* the projects in *Kelley II* did not derive all of their revenues from individual user fees. Instead, some of the revenues came from rent that the Commonwealth paid to the authority. Nevertheless, the court relied on *Tranter* and held that the obligations were self-liquidating and, therefore, were not debts. "A self-liquidating project may be defined as one wherein the revenues received are sufficient to pay the bonded debt and interest charges over a period of time. *The source of the receipt is not important. . . ."* *Kelley II* at 345, 190 A. at 144. (emphasis added) Thus the court effectively expanded the definition of self-liquidating by classifying the Commonwealth as a user. The court added that, "if such obligations are met from current revenues from year to year, they cannot be considered debts in the constitutional sense, even though the aggregate or sum total of all payments should exceed the constitutional limitation." *Kelley II* at 347, 190 A. at 145. Because the facts showed that the payments from the patients and the counties would be sufficient to allow the Commonwealth to satisfy the annual rent, the authority's revenue from the rents would be sufficient to service its debt, and the project would be self-liquidating. *Id.* at 346, 190 A. at 144-45.

In addition, the court held that the Commonwealth's obligations were not debt because the Commonwealth did not pledge any property to secure the debt. *Id.* at 347-48, 190 A. at 146. In the event of a default, the bondholders could assume control of the property, operate it and collect the revenues to satisfy the debt. *Id.*

By stipulation of the parties, however, the bondholders would have no power to execute on the assets of the project. *Id.* at 341 and n.1, 190 A at 142 and n.1. See also, *Tranter,* at 86, 173 A. at 298 ("This difference between a pledge of property and a pledge of income merely, has been said to distinguish a transaction which creates a debt within the constitutional limitation from one creating a debt not within it."), quoted in *Kelley II,* at 349, 190 A. at 146.

The projects in *Kelley II* are distinguishable from the city's stadium project in that the city does not propose to pay the rent out of revenues derived directly from the projects. Instead, the city will pay rent out of its general revenues. In *Greenhalgh v. Woolworth,* 361 Pa. 543, 64 A.2d 659 (1949), the court implictly held that this distinction too, is not controlling. There, the plaintiffs challenged a lease between a school district and an authority. Under the lease agreement, the authority constructed a school building and leased it to the school district for 30 years. *Id.* at 548, 551, 64 A.2d at 662, 664. The school district paid annual rent at an amount equal to the principal and interest on the bonds issued to finance the construction of the school plus the authority's administrative expenses. *Id.* at 548, 64 A.2d at 662. The lease obligated the school district to pay the rent only out of current revenues. *Id.* at 553, 64 A.2d at 664. If current revenues for a given year were not enough to pay the entire rent, the balance would "be paid out of the current revenues of succeeding years." *Id.* at 555, 64 A.2d at 665. The court found that the school district's reasonably anticipated revenues *from all sources* were in fact sufficient to meet its rental obligations. *Id.* at 548, 64 A.2d at 662. The court held that the project was self-liquidating, and therefore not debt. *Id.* By interpreting the school district's current revenues

to mean the school district's current revenues from any source, not just from the project, the court again expanded the definition of self-liquidating. See Morris, *supra* at 254 n.53. The court found additional support that the leases were not debt in that the lease limited the remedies available to the authority on default. *Greenhalgh,* at 555, 64 A.2d at 665. The authority—or its bondholders—could declare forfeiture of the lease and appoint a receiver to operate and maintain the project. If appointed, the receiver had no power to sell or dispose of the assets. *Id.*

The court followed this expanded definition of self-liquidating in *Conrad v. Pittsburgh,* 421 Pa. 492, 218 A.2d 906 (1966). The plaintiff in *Conrad* challenged a contract between the City of Pittsburgh and the city's stadium authority. The city gave land to the authority to build Three Rivers Stadium and the authority obtained financing to build it. *Id.* at 497, 218 A.2d at 908. Though the authority received income from the stadium by leasing it to the teams, the agreement provided that the city would make an annual grant to the authority equal to any deficiency between the authority's income and the amount required to service its debt and maintain the stadium. *Id.* at 498, 218 A.2d at 909. The city would pay the grant out of current revenues. *Id.* If current revenues were not sufficient to pay that deficiency, the city was required to pay the deficiency "out of the current revenues of the city in the subsequent year or years." *Id.* In addition, the bondholders remedies on default were limited to the operation and maintenance of the project. *Id.* at 503, 218 A.2d at 912. As in *Greenhalgh,* the bondholders could not circumvent the limitation restricting the school district's or city's obligation to its current revenues by subjecting the assets of the projects to sale

or execution. *Id.* at 503, 218 A.2d at 912. The court held that the city's obligations were not debt. *Id.*

## C. The City's Obligations Under the Prime Leases Are Not Debt

The plaintiffs urge that the city's obligation under the stadium deal constitutes debt. In determining whether the prime leases impose a debt on the city, however, this court is bound by the evolving meaning of debt set forth in *Tranter, Kelley II, Greenhalgh* and *Conrad.* Those cases define debt to exclude a government obligation under a long term lease agreement with a public authority if (1) the obligation is specifically limited to the government's available current revenues, and (2) the authority and its bondholders cannot circumvent this limitation by subjecting the city's assets to sale or execution on default. *Tranter* at 84, 173 A. at 297; *Kelley II* at 349, 190 A. at 147; *Conrad* at 503, 218 A.2d at 911-12; *Greenhalgh* at 555, 64 A.2d at 665. See also, *Weiner v. City of Philadelphia,* 22 Phila. 267 (1991), *aff'd w/o op.,* 528 Pa. 353, 598 A.2d 30 (1991) (per curiam). The current revenues need not come from the project itself. *Conrad* at 503, 218 A.2d at 911-12; *Greenhalgh* at 548, 64 A.2d at 662.

Because the city's obligations under the prime leases satisfy this test, they are not debt.

### 1. The prime leases restrict the city's rental obligations to current revenues

As with the agreements in *Greenhalgh* and *Conrad,* the prime leases expressly provide that the city's obligations are limited to current revenues. Prime lease §4.2(a). But the language of the prime leases is not quite the same as that in the *Greenhalgh* and *Conrad* agree-

ments.[3] In those agreements, the school district and city, respectively, were required to pay this year's shortfall out of current revenue in the "succeeding years" and "the subsequent *year or years.*" *Greenhalgh* at 555, 64 A.2d at 665; *Conrad* at 503, 218 A.2d at 911. The prime leases, however, say that in the event of a shortfall in current revenues this year, the city "shall produce sufficient current revenues to pay in the ensuing fiscal *year* such balance due for the preceding fiscal year in addition to the amount of rent due for the ensuing fiscal year." While the *Greenhalgh* and *Conrad* agreements seemed to allow the school district and city to roll over shortfalls year after year, the prime leases seem to allow the city to roll over a shortfall only to the successive year, when the city *must* pay the shortfall. The plaintiffs argue that this distinction makes the obligation a debt.

Judge Della Porta of this court rejected this same argument in *Weiner v. City of Philadelphia,* 22 Phila. 267 (1991), *aff'd w/o op.,* 528 Pa. 353, 598 A.2d 30 (1991) (per curiam). In *Weiner,* the plaintiffs challenged a lease and service agreement between the City of Philadelphia and the Pennsylvania Convention Center Authority. Under the agreement the authority built and operated the convention center and financed part of the cost by issuing bonds. By a provision substantially identical to section 4.2(a) of the prime leases, the agreement bound the city to pay a service fee equal to the authority's annual debt service on the bonds. The service fee was

---

3. The prime lease obligates the city to indemnify PAID in certain situations to the extent "permitted by applicable laws . . . ." prime lease §18.8(a). Applicable laws would include the constitutional current revenue and no execution restrictions, *Conrad* at 498-503, 218 A.2d at 909-12, and the statutory prohibition against city guaranties of authority debts, see 73 P.S. §§376.3(c), 377(a) and 377(c).

limited to current revenues. As with the prime lease, if the current revenues of a given year were insufficient to pay the service fee, the city was required to "produce sufficient current revenues to pay in the ensuing fiscal year such balance due for the preceding fiscal year in addition to the amount of service fee for the ensuing fiscal year." Citing *Greenhalgh* and *Conrad,* Judge Della Porta held that the obligation was not debt. The Pennsylvania Supreme Court affirmed per curiam without opinion. *Weiner* 528 Pa. 353, 598 A.2d 30.

Because Judge Della Porta held in *Weiner* that language substantially identical to paragraph 4.2(a) of the prime leases do not create a debt, this court holds that the city's obligation under the prime leases are not a debt. See *Yudacufski v. PennDOT,* 499 Pa. 605, 612, 454 A.2d 923, 926 (1982) ("It is well-settled that, absent the most compelling circumstances, a judge should follow the decision of a colleague on the same court when based on the same set of facts.").

## 2. There is sufficient evidence in the record pertinent to the ordinances that the city's revenues will allow the city to satisfy its rent obligations

In *Kelley II* the court based its holding, in part, on a finding that the Commonwealth's projected revenues would be sufficient to allow it to satisfy its rent obligations. *Kelley II* at 347, 190 A. at 145. The record pertinent to the passage of the stadium ordinances contains sufficient evidence that the city's revenues during the term of the stadium leases will allow the city to satisfy its rent obligations. See "Review of Impact of City Funding of New Stadium Costs on City General Fund" (Dec. 1, 2000); Testimony of William P. Hankowsky; and "Stadium Tax Revenue Model" (Nov. 27, 2000). The plaintiffs have produced no evidence to the contrary.

### 3. The prime leases limit PAID's remedies on default such that PAID and its bondholders cannot circumvent the current revenues limitation

The prime leases bar acceleration of rent or termination of the leases by the authority. Prime leases, §15.2(c). This limitation provides additional support for the finding that the prime lease does not create a debt. The city has not pledged its assets in the projects—the leasehold interests—as security for the deal. It has pledged only current revenues. The bondholders cannot circumvent the current revenues limitation by accelerating the city's obligations under the lease or terminating its leasehold interest. See *State ex rel, Thomson v. Giessel,* 72 N.W.2d 577, 592 (Wis. 1955) (holding that building corporation's lease to state was not a debt when, among other reasons, the building corporation had no right of re-entry and no right of foreclosure).[4] Com-

---

4. The court notes that the prime leases make the city's obligation to pay rent unconditional, prime lease §4.5, and it allows PAID to obtain an injunction ordering the city to pay rent. Prime lease §15.2. The right to an injunction flows to the bondholders as assignees of PAID's rental interests. Prime lease §§4.3, 19.3, 19.4. Since the city's obligations are legally enforceable by the bondholders, the prime leases arguably run afoul of *Greenhalgh.* In discussing the creditor's limited remedies against the city, the court in *Greenhalgh* said:

"[A]lthough the authority may declare the lease forfeited and re-enter the premises for a default of six months or more in the payment of a rent installment, etc., and may have a receiver for the property appointed, *manifestly there is no legally enforceable liability for either the principal or interest attaching to the school district.* The power of such a receiver is even 'limited to the operation and maintenance of the project;' and he is without power to 'sell or dispose of any assets of the authority [or] the land upon which the project is erected.' " *Greenhalgh* at 555, 64 A.2d at 665. (emphasis added)

The city's obligations under the prime leases constitute a "legally enforceable liability for either the rent or principal attaching to the [city]," which would arguably conflict with *Greenhalgh. Id.;* see also,

pare with 73 P.S. 377(d) (permitting an authority to pledge its *own* assets as security for an indenture). In addition, similar to a pay-as-you-go obligation, the city's right to receive consideration in any given year is independent of its payments in previous years. And, unlike a borrower's interest in a capital asset acquired on credit, the city's leasehold interest in the stadiums reverts to PAID when the lease expires.

In summary, then, it may seem at first glance that the city has committed itself to a $394 million debt. But, the city's obligations under the agreement are limited to current revenues and are not subject to acceleration. The city's rights are not subject to termination. Our

---

*Graham v. Philadelphia,* 334 Pa. 513, 518, 6 A.2d 78, 81 (1939). Courts considering constitutional debt restrictions in other states have held that a government incurs a debt by paying rent to an authority if the government's obligations to the authority are legally enforceable by the bondholders. See *e.g., New Liberty Med. and Hosp. Corp. v. E.F. Hutton & Co.,* 474 S.W.2d 1, 6 (Mo. 1971); *Dykes v. Northern Va. Transp. Dist. Comm'n,* 411 S.E.2d 1, 10 (Va. 1992) (*on reh'g*); *State ex rel. Thomson v. Giessel,* 72 N.W.2d 577, 592 (Wis. 1955). See also, *Johnson v. Pennsylvania Housing Financial Agency,* 453 Pa. 329, 344, 309 A.2d 528, 536 (1973) (describing the Commonwealth's obligation to pay an authority's debts as a "moral make-up clause" where the agreement makes the obligation unenforceable). But our Supreme Court implicitly foreclosed such an argument in *Conrad.* In *Conrad,* the court approved the lease even though the bondholders could compel payments from the city, because the bondholders could only compel the city to make payments from current revenues. *Conrad* at 503, 218 A.2d at 911. Like bondholders in *Conrad,* the holders of PAID's bonds may compel rent payments from the city, *but only from current revenues.* See also, *Kelley II* at 349, 190 A. at 147 (there is one outstanding factor [in this case]—the immunity of state property and the inability of creditors to compel payments beyond the sums available from current revenues). The bondholders cannot take city property.

This court concludes, too, that the terms of the prime leases here are more favorable than in *Greenhalgh* because unlike the authority in *Greenhalgh,* PAID cannot declare the lease forfeited or reenter the premises.

Supreme Court has said that, whatever such an agreement between a city and a public authority is, it is not debt.[5]

The plaintiffs' prayer for relief on the constitutional claim must fail.

## II. *PAID Has Not Pledged the City's General Credit and Taxing Power in Violation of the Enabling Act*

The plaintiffs maintain that the defendants have violated the Economic Development Financing Law (Enabling Act) by pledging the city's credit. 73 P.S. §371 et seq. This court disagrees. The Enabling Act provides that:

"An authority created hereunder shall have no power at any time or in any manner to pledge the general credit or taxing power of the Commonwealth nor shall any authority created hereunder have the power at any time to pledge the general credit or taxing power of any political subdivision . . . ." 73 P.S. §376(c). See also, 73 P.S. §377(c).

Therefore, when PAID issues bonds, it must place a disclaimer on the bonds disclosing to the bondholders that PAID is obligated to pay principal and interest only from available funds as authorized under the Enabling Act and that the city's credit is not pledged. 73 P.S. §§376.3(c) and 377(a) (contents of disclaimer). The terms of the bonds are subject to the city's approval,

---

5. Philadelphia sports fans are likely familiar with a large green animal that appears at Veterans Stadium during baseball games. He tries to instill hope and a sense of well-being in loyal fans jaded by millionaire players, millionaire owners who field substandard teams in one of the nation's biggest media markets, and governments that subsidize private sports enterprises. That animal has feathers, a tail and an oversized proboscis. He waddles. Nonetheless, fans would agree that—whatever he is—he is not a duck. And so it is with Philadelphia's stadium deal. It is not a debt.

such that the city will be able to ensure that the required disclaimer is present.

There is no evidence that PAID has issued bonds pledging the city's general credit or taxing power or bonds failing to include the required disclaimer. There is no evidence that the city has approved illegal bonds. In fact, plaintiffs have not produced evidence that PAID has issued bonds at all. Because there has been no conduct violating 73 P.S. §376(c), this claim must fail.

The plaintiffs have no right to relief on their Enabling Act claim.

## III. *The Process by Which City Council Approved the Leases and the Stadium Funding Did Not Violate the Home Rule Charter*

The Home Rule Charter requires that city council take every legislative action, including actions authorizing leases for more than one year, by ordinance. 351 Pa.Code §§2.2-200, 2.2-309, 8.8-200(3). Every proposed ordinance must be introduced as a bill, 351 Pa.Code §2.2-201(1). Before city council considers a bill, the bill must be "referred to a committee, considered at a public hearing, reported by the committee, printed as reported, and distributed to the members of the council and made available to the public." 351 Pa.Code §2.2-201(2).

The plaintiffs argue that city council violated the Home Rule Charter because key data was missing from the stadium ordinances, namely, the team subleases and the anticipated source of the $53 million shortfall in funding for the stadium.

## A. The Process By Which City Council Approved the Team Subleases Did Not Violate the Home Rule Charter

The bills that city council considered and passed on December 20, 2000 included copies of the ground leases, prime leases and leasebacks. See ordinance nos. 721-A and 722-A. City council did not consider and pass the actual team subleases as part of the ordinances. Instead, city council approved by ordinance the team sublease terms and conditions. See ordinance 721-A, exhibit D; ordinance no. 722-A, exhibit D. City council approved the actual team subleases by resolution more than one month later.

The plaintiffs argue that, since the actual team subleases were not part of the bill that city council passed by ordinance, the team subleases were never "referred to a committee, considered at a public hearing, reported by the committee, printed as reported, and distributed to the members of the council and made available to the public. . ." and are therefore invalid. This court disagrees. City council properly approved the substance of the team subleases by passing these team sublease terms and conditions in accordance with the Home Rule Charter. The resolution process—by which city council reviewed the team subleases for conformance with the ordinances—was not required by the Home Rule Charter and, therefore, not subject to the procedural requirements of the Home Rule Charter. If city council had approved by resolution final team subleases that differed materially from the approved team sublease terms and conditions, the team subleases might not be legal. However the plaintiffs have not cited any term in the team subleases, let alone any material term, that conflicts with the terms and conditions approved by ordi-

nance. Therefore, the court must conclude that the team subleases do not violate the Home Rule Charter because they conform in all material respects to the terms and conditions that city council passed by ordinance.[6]

## B. City Council Did Not Violate the Home Rule Charter by Approving the Stadiums' Ordinances Knowing That $53 Million of the Stadium Deal Was As Yet Unfunded

When city council held hearings on the stadiums, $53 million in funding for the stadiums was as yet unsecured. There was no explanation of how the parties would get the additional $53 million, except that the money would *not* come from the city. (2/16/01; N.T. 31.) The parties stipulated that had plaintiffs Lance Haver and Richard Sklaroff known the sources for the $53 million, they would have testified as to that issue. (2/16/01; N.T. 32-33, 35-36.) The plaintiffs argue that city council violated the Home Rule Charter because the source of the $53 million was not part of the ordinance. The court disagrees.

The ordinance provided that there was to be a $53 million gap in funding, but made clear that that $53 million is not the city's obligation. This information was sufficient to provide for meaningful consideration of the terms of the deal.

The plaintiffs' claim that there was a violation of the Home Rule Charter is without merit.

---

6. Defendants also argue that the Home Rule Charter did not require city counsel to approve the team subleases at all because the city was not a party to the team subleases. This court does not see a need to address this issue.

## CONCLUSION

In sum, the plaintiffs have no right to relief on any of their claims. Accordingly, this court granted the defendants' motion for a nonsuit and denied the plaintiffs' post-trial motion to remove the nonsuit. For the reasons discussed, this court's orders should be affirmed.