Detweiler, Appellant, *v.* Hatfield Borough School District.

556

Argued January 7, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and AR-NOLD, JJ.

*Thomas B. Moreland Porter, Jr.,* with him *Foulke, Knight & Porter,* for appellants.

*Francis H. Bohlen, Jr.,* with him *Louis M. Childs, 2nd, Anderson Page* and *High, Swartz, Childs & Roberts,* for North Wales Borough School District, appellee.

*Anderson Page,* with him *David E. Groshens, Robert B. Brunner, John E. Landis* and *Frances H. Bohlen, Jr.,* for Hatfield Borough School District and Lansdale Borough School District, appellees.

OPINION BY MR. JUSTICE CHIDSEY, March 22, 1954:

The plaintiffs in the three cases before us are residents and taxpayers respectively of the several School Districts of the Boroughs of Hatfield, Lansdale and North Wales, Montgomery County. They brought separate actions in equity to enjoin the defendant school districts from carrying out the provisions of certain agreements made by and between the defendants and three other school districts establishing a joint secondary school, and from entering into and carrying out the terms of a proposed lease agreement between the school districts forming the joint school and the North Penn Joint School Authority of Montgomery County. Relief was asked for on the ground that the defendants' participation in the proposed agreement of leasing and the performance of the joint school agreement would be violative of Article IX, Sections 8 and 10 of the Constitution of Pennsylvania and of the

School Code. The defendants filed preliminary objections in the nature of demurrers in each case and attached thereto admittedly true and correct copies of the agreements referred to in the plaintiffs' complaints. The learned chancellor sustained the preliminary objections and dismissed the complaints, and from the decree entered in each case the present appeals are taken. The cases were argued in this Court at the same time and will be considered together as they were in the lower court.

Preliminarily the plaintiffs complain of the court below rendering a final judgment based upon facts not appearing in the complaints. More specifically they contend that defendants' demurrers were bad as speaking demurrers and that the lower court was in error in finding that a speaking demurrer is proper under the present Rules of Civil Procedure. While we cannot agree with this conclusion of the learned court below, we do not believe the preliminary objections in these cases may be adjudged speaking demurrers. The time honored principle that in passing on a demurrer a court cannot consider matters collateral to the pleading opposed but only such matters as arise out of the statement of claim or complaint itself, is still preserved under Pa. R. C. P. 1017. (See Goodrich-Amram Civil Practice §1017(b)-11). In the instant case, the plaintiffs' causes of action were predicated on the unconstitutionality and illegality of the agreements entered into and about to be entered into by the defendants. Since the plaintiffs averred the existence of these documents and relied on them to establish their claims, the defendants could properly annex the agreements to their demurrers for they were in every sense of the term factual matters arising out of the complaints themselves. The instruments formed the very foundation of the suits and were properly considered by the

court below in determining whether the plaintiffs alleged any facts justifying the equitable relief sought. At the same time the court was not bound to accept as true the averments in the complaints as to the legal effect of the agreements, for although a demurrer admits every well pleaded, material, relevant fact and every inference fairly deducible from the facts pleaded (*Byers v. Ward*, 368 Pa. 416, 84 A. 2d 307), it does not admit as true an alleged construction of a written instrument.

The six school districts, including the defendants, in 1952 entered into written agreements for the establishment of a joint secondary school to be known as North Penn Joint Secondary School pursuant to the provisions of the School Code (Act of March 10, 1949, P. L. 30, Article XVII, §1701 et seq., 24 PS §17-1701). The school districts caused the North Penn Joint School Authority to be incorporated and requested the Authority to make certain alterations and additions to the present Lansdale High School building with money borrowed by the Authority. A proposed lease agreement, dated as of October 1, 1953, was drawn up whereby title to the buildings would be conveyed to the Authority, which in turn would lease the buildings to the school districts at an annual rental deemed sufficient to pay the interest and amortize the principal of bonds issued by the Authority.

Appellants essentially contend (1) that the project calls for a return of the leased property to the school districts upon the expiration of the lease and this is equivalent to the purchase of a capital asset without conforming to the restrictions imposed by Sections 8 and 10 of Article IX of the Constitution of Pennsylvania; (2) the project is not self-liquidating in that the school districts can be compelled to pay beyond their current revenues and the undertaking pledges

capital assets of the school districts as security for the bondholders. It is also contended that the joint school agreement is invalid for reasons hereinafter set forth and considered, and therefore the school districts could not jointly enter into the lease agreement with the Authority.

Questions arising under Sections 8 and 10 of Article IX of the Constitution of this Commonwealth have been before us many times. Section 8 of Article IX prohibits school districts from contracting debts exceeding 7% of the assessed valuation of their taxable property or incurring new debts or increasing existing indebtedness to an amount exceeding 2% of such assessed valuation without the consent of the electorate. Article IX, Section 10 makes it mandatory upon school districts, at or before the incurring of such indebtedness, to provide for the collection of an annual tax sufficient to pay the interest and principal within thirty years.

Certain principles annunciated by this Court in the cases of *Greenhalgh v. Woolworth et al.*, 361 Pa. 543, 64 A. 2d 659, and *Kelley v. Earle et al.*, 325 Pa. 337, 190 A. 140, govern the disposition of the constitutional issues that confront us. In those cases similar arguments were presented as to the acquisition of capital assets by installments but in each case we concluded that none of the attributes of a purchase was present in the agreements, which were nothing more than straight leases.

The lease in the present case provides that title to the premises is vested in the Authority and the Authority agrees to lease the buildings to the school districts for a term of 30 years. It provides further in Section 14 that, "The School Districts agree that at the termination of this Lease, or at its earlier termination in accordance with its provisions, they will sur-

render or cause to be surrendered, quiet and peaceable possession of the demised premises to the Authority and without further notice which now or hereafter may be required by the laws of Pennsylvania.". This was precisely the situation in the case of *Kelley v. Earle et al.*, supra, and this Court in construing the lease, stated at p. 349: ". . . Here a capital asset, as it has been termed, is not received in the present, though payments on the lease are to be made from time to time. What the State is undertaking is not the outright purchase of an improvement, but a lease of an improvement on the payment of a moderate annual rental. The State pays as it goes and receives consideration for each payment as it falls due. There is no purchasing here on the credit of the future; for each payment made there is a present benefit to the State. . . .". Although the lessees entered into an agreement among themselves as to how their respective interests in the property would be apportioned when the lease ended, this would in no way bind the lessor Authority, which was not a party to that agreement.

That the school districts contemplate and provide inter se for acquisition of the leased property at some future time not now determinable does not destroy the effectiveness of the lease. Its validity is to be determined as of the time it is made. See *Duane v. Philadelphia et al.*, 322 Pa. 33, 185 A. 401; *Addyston Pipe and Steel Company v. City of Corry*, 197 Pa. 41, 46 A. 1035. The lease is the antithesis of a purchase, for by its terms the Authority will receive title in praesenti and at the end of the 30 year period title remains in it, unencumbered by the lease. If the transaction, valid at its inception, later becomes subject to constitutional attack, such contingency will be met when it arises. It is to be observed that under Section 14 of the Municipality Authorities Act of 1945, as amended, 53

PS §2900z-15, an Authority may convey a school project to the school districts to which the project was leased after it shall have finally paid and discharged all bonds which shall have been secured by a pledge of the revenues of the school project. And this section also provides that upon termination of the existence of the Authority ". . . the property of said Authority shall pass to the municipality or municipalities or the school district or districts, as the case may be, . . .".

Appellants urge that this case differs from the *Greenhalgh* case, supra, because Section 8 of this lease contains a covenant on the part of the school districts to turn over to the Authority the proceeds from the sale of unused and unnecessary school lands and buildings. While it is true that this particular provision was not present in the lease in the *Greenhalgh* case, we fail to see how it adversely affects the self-liquidating character of the project or how the defendants have thereby illegally pledged capital assets as security for the debt.

A self-liquidating project was defined by this Court in the *Kelley* case, supra, at p. 345, as one ". . . wherein the revenues received are sufficient to pay the bonded debt and interest charges over a period of time. The source of the receipt is not important. . . .". In the case at hand the rentals will be sufficient to meet the principal and interest on the bonds and those rentals will be derived from the current revenue of the school districts. Complainants do not aver or contend that the current revenues of the school districts are insufficient in this regard. This method of financing was specifically approved in the *Greenhalgh* case, where we said at p. 552 that ". . . a school building project under the instant Authority Act is self-liquidating if the annual rentals for the building, payable by

the School District from current revenues, are sufficient to discharge, over the period of years fixed by the lease, all debt service and the entire debt incurred by the lessor in the construction of the project. . . .". The project being self-liquidating within the definition promulgated by this Court, its legality is not tainted because there are other funds available for expediting the liquidation of the project. We do not feel the constitutional limitations will be violated by appropriating such funds to foster the project.

Under the covenant contained in Section 8 of the lease the school districts do not agree to sell unused and abandoned buildings and sites, but to appropriate to the Authority an amount equivalent to the net proceeds of any such sale, if and when made. Such contemplated future appropriation may lawfully be made, as hereinafter pointed out. The school districts are not obliged to sell, and a sale is a prerequisite to the appropriation. There is no pledge of capital assets. Under Section 19 of the lease, in the event of a default on the part of the school districts, the appointment of a receiver is provided for to take possession of the property conveyed for its operation and maintenance. The lease gives notice to the bondholders that they are to look to the rentals alone for their security. No recourse is given to the bondholders or to the Authority against the land conveyed by the school districts to the Authority, nor against any other lands of the school districts.

Appellants claim that any appropriation to the Authority made possible by the provisions of Section 8 would violate that section of the School Code which regulates the use of funds derived from the sale of unused lands. (Act of March 10, 1949, P. L. 30; Act of April 21, 1949, P. L. 677; 24 PS §7-707). These Acts require school districts to use the funds derived from

the sale of real estate, other than those originally acquired at any sale on a tax or municipal claim, etc., for debt service or for capital expenditures. Under Section 9 of the Municipality Authorities Act (Act of May 2, 1945, P. L. 382, as variously amended, the last amendment being effective January 21, 1952, P. L. 2188, 53 PS §2900z-10), the school districts are authorized to convey or pay over to any Authority any interest in real or personal property, or any funds available for building construction or improvement purposes. This section of the enactment is controlling where Authorities acquire projects by an agreement with school districts, notwithstanding provisions of other laws to the contrary.[1] Any sum utilized in making additions and betterments of a permanent nature to property is a capital expenditure. The Municipality Authorities Act embraces the contemplated appropriation in exact terms. Since the Legislature empowered school districts to transfer funds available for capital expenditures to Authorities in furthering the construction and improvement of a project, appellants' contention in this regard cannot be sustained.

It is contended that the joint school agreements accomplishing the "jointure" are invalid and that any funds expended or any acts performed in pursuance of

---

[1] Section 9, C. provides: "This section, without reference to any other law, shall be deemed complete for the acquisition by agreement of projects, as defined in this act, located wholly within or partially without the municipality or municipalities* causing such Authority to be incorporated, any provisions of other laws to the contrary notwithstanding, and no proceedings or other action shall be required except as herein prescribed.".

And see the Public School Code of March 10, 1949, Article VII, Section 790, added January 21, 1952, P. L. 2195, Section 3, 24 PS §7-790.

* Under the amendment of January 21, 1952, the term "municipality" was defined as including a school district.

the jointure would be violative of the School Code of 1949. The reasons assigned for the alleged invalidity are that the jointure was entered into pursuant to a county-wide plan for the merger of school districts which cannot be effected without submission to and approval of the electorate; that the jointure contract is vague and illusory and so indefinite in its terms as to be unenforceable, and that it is illegal and unenforceable in that it deprives future school directors indefinitely of the right to exercise their discretion in the management of school affairs.

We deem it immaterial that the jointure may be or is a first step in a merger of the school districts as averred in one of the complaints. There is nothing in the School Code to prevent subsequent merger of school districts after their creation of a joint school. The question is what does the agreement between the districts create. Section 1701 of Article XVII of the Public School Code of 1949 provides, inter alia, that "The board of school directors in any two or more school districts may . . . establish, construct, equip, furnish, and maintain joint elementary public schools, high schools, consolidated schools or any other kind of schools or departments provided for in this act. . . .".

The paramount objective of the Legislature in authorizing the consolidation and establishment of joint schools was to provide a more efficient and less expensive education for the student: See *Walker's Appeal,* 332 Pa. 488, 491, 492, 2 A. 2d 770. Cognizant of these advantages, these six contiguous school districts entered into a contract and in paragraph one they declared in clear and unequivocal terms "That a Joint Secondary School for pupils from Grades Seven to Twelve, inclusive, be and is hereby established by the aforementioned School Districts, as authorized and provided for by Article XVII of the State Public School

Code of 1949. . . .". There was embodied in the agreement every prerequisite for the creation of a joint school. There is nothing in the agreement which imports any intention to form a merger or a step toward a merger. Obviously an agreement exclusively concerned with secondary education does not cover the entire teaching field of a school district. It establishes an entity within the broader powers and duties of the school districts which respectively retain their separate identities. In a merger the school districts party thereto surrender and lose their separate identities.

School districts are amenable to a court of equity by way of injunction when their acts transcend the legal limits that bind their powers. However, we have never questioned the policies of school directors where the board acts within the scope of its statutory authority and in good faith: *Regan et al. v. Stoddard et al.*, 361 Pa. 469, 474, 65 A. 2d 240; *Day et al. v. Amwell Township School District*, 283 Pa. 248, 128 A. 846; *Hibbs et al. v. Arensberg et al.*, 276 Pa. 24, 119 A. 727. In view of the foregoing provisions of the School Code which expressly sanction the creation of a joint school, the sections pertaining to the mergers of school districts have no bearing on the instant controversy.

Equally unfounded are appellants' objections that the jointure contract was unenforceable because the beginning and termination dates were indefinite and that it deprived future school directors of discretion in the management of school affairs.

It is provided in paragraph two of the jointure agreement that "The operation of a Joint Secondary School under this agreement shall commence immediately in the presently existing facilities of the various districts and at Lansdale; and at Lansdale from the date of the completion of the construction of such school

buildings as may be originally decided upon by the Joint Board as necessary prior to the operation of the Joint Secondary School there, . . .". Appellants concede, as they must, that the term "immediately" is not too indefinite for that would necessarily imply the date of the agreement itself. It is their contention that the language following the semicolon brings about the indefiniteness because it indicates the joint school will not begin to function until all buildings have been completed. We believe it is readily discernible that the joint school was to commence simultaneously with the execution of the agreement. Exactly when the joint school situs would be transferred to Lansdale could not be ascertained with certainty until construction was completed, but this factor in no way affected the contract's validity, for the initial date of its operation was definitely established and its termination date was 20 years after the completion of the Lansdale improvements. It may be assumed that these improvements will be completed within a reasonable time, for the whole purpose of the jointure was to centralize the activities of the joint school at Lansdale. The fact that there is a provision for withdrawal by any school district 20 years after the completion of the Lansdale improvements indicates that the contract is thereafter no longer binding and this establishes a definite duration, subject to voluntary renewal. Therefore, it cannot be seriously contended that the jointure was to continue perpetually, and this is appellants' complaint. Since the jointure was not to endure perpetually, it follows that the freedom of action of future boards is not improperly encroached upon for they have the power at the end of the period named in the agreement to continue or discontinue membership in the joint school. Subsequent boards are always bound by contracts validly made by former members: *Horvat v. Jenkins*

*Township School District,* 337 Pa. 193, 195, 10 A. 2d 390; *Altman, for use v. Uniontown School District,* 334 Pa. 336, 340, 5 A. 2d 896. Admittedly the agreement might have been couched in more explicit language, but it is sufficiently plain and unambiguous for its interpretation to be for the Court, and we are satisfied that the lower court correctly construed it and upheld its validity.

Inasmuch as the proposed lease may be properly entered into by the defendants and has none of the characteristics of a purchase, and the rentals which the defendants are obliged to pay will not overreach current revenues, there is no violation of either Section 8 or Section 10 of Article IX of the Pennsylvania Constitution. The provisions of the Constitution and all pertinent laws of the Commonwealth having been observed in connection with the project, the plaintiffs' complaints failed to establish causes of action entitling them to the injunctive relief sought, and the preliminary objections in the nature of demurrers filed by defendants were properly sustained.

The order dismissing the complaint in each case is affirmed at the costs of the plaintiffs therein.