In re ESTATE OF Henry W. BARTOL, Deceased.

Appeal of Drs. Norman F. Hess and Martin A. Pomerantz.

Commonwealth Court of Pennsylvania.

Argued March 1, 2004.

Decided April 7, 2004.

Wendy W. McLean, Malvern, for appellants.

P. Clarkson Collins, Jr., Wilmington, DE, for appellees, University of Delaware–Bartol Research Institute, et al.

BEFORE: McGINLEY, Judge, and LEAVITT, Judge, and McCLOSKEY, Senior Judge.

OPINION BY Judge LEAVITT.

This is an appeal by Norman F. Ness and Martin A. Pomerantz (Appellants) from an order of the Orphans' Court Division of the Court of Common Pleas of Philadelphia County (trial court). In its order, the trial court sustained a preliminary objection of the University of Delaware–Bartol Research Institute, The Franklin Institute, Bartol Research Foundation[1] and the University of Delaware (collectively Respondents) that Appellants lacked standing to initiate an action against Respondents under Section 5793(a)

---

1. The University of Delaware Bartol Research Institute, The Franklin Institute and the Bartol Research Foundation are each Pennsylvania nonprofit corporations with a registered address at Ben Franklin Parkway, 20th Street, Philadelphia, Pennsylvania 19103.

of the Nonprofit Corporation Law of 1988, 15 Pa.C.S. § 5793(a). We affirm.

The facts are not in dispute. On December 19, 1918, Henry W. Bartol died leaving a written will and codicil. Mr. Bartol devised and bequeathed certain residual property to The Franklin Institute (TFI) for the establishment and maintenance of a research facility dedicated to electrical science (Operating Facility). In 1925, using funds provided by the Bartol estate, TFI created the Bartol Research Foundation to support and conduct the scientific research of the Operating Facility at TFI. The original funds were insufficient for the Bartol Research Foundation to function as envisioned and, in 1927, TFI sought additional support from Swarthmore College. Between 1927 and 1977 the Operating Facility was located at Swarthmore College and was funded by the Bartol endowment, *i.e.*, the Bartol Research Foundation, along with additional proceeds derived from third-party grants and other contracts.

When TFI's lease with Swarthmore College expired in 1977, the University of Delaware (University) was selected as the relocation site for the Operating Facility. TFI and the University executed a memorandum of affiliation that set forth the terms of the joint venture between TFI and the University's physics department. The University agreed to provide necessary office and laboratory space while TFI agreed to bear the costs of renovation and pay maintenance fees. Bartol faculty members were designated as such in University catalogs and given all privileges normally granted to the University's adjunct faculty. Although the University's physics department and the Bartol Operating Facility were to continue as separate entities, the memorandum of affiliation contemplated beneficial interactions between the two and substantial benefits to

each. TFI and the University planned to review their affiliation in its tenth year, or 1987.

In 1987, the University and TFI entered into a Sponsorship Agreement, prompted by the recognition that the assets bequeathed by Mr. Bartol were inadequate to fund the activities of the Operating Facility. Pursuant to that agreement, TFI filed a plan of division to create two new Pennsylvania nonprofit corporations. The first corporation, the Bartol Research Foundation, was created to hold the Bartol assets previously held by TFI in a fund with the same name. The Bartol Research Foundation, managed by two trustees designated by TFI and one trustee designated by the University, was charged with managing the income generated by the Bartol fund to support the second new corporation, the University of Delaware–Bartol Research Institute (Bartol Institute). The Bartol Institute took the place of the Operating Facility, and its stated purpose was

> benefiting and carrying out the purposes of TFI and the University, primarily by carrying out scientific research along the general lines contemplated by the Will and Codicil of Henry W. Bartol [the "Bartol Activities"]. TFI and the University acknowledge that such purposes include benefiting the educational and research activities of the Department of Physics of the University.

Reproduced Record 142a (R.R. ——). The Sponsorship Agreement obligated TFI to subsidize the operations of the Bartol Institute for five years, after which the University would be obligated to provide all of the supplemental funding needed to operate the Bartol Institute. The Sponsorship Agreement also provided for changes in corporate governance to reflect these changes in the financing of the Bartol Institute. A five-member board of

trustees was established to govern the Bartol Institute, with TFI appointing two trustees and the University appointing three. By 1992, however, the University would appoint all five trustees. Finally, the Sponsorship Agreement established the administrative position of President of the Bartol Institute.[2]

Dr. Martin A. Pomerantz served as Director of the Bartol Research Foundation from 1959 to 1986, prior to the creation of the nonprofit corporation with the same name, when the designation referred to a fund held by TFI to support the activities of the Operating Facility, also operated during this time as a division of TFI. In 1987, Dr. Norman F. Ness effectively succeeded Dr. Pomerantz when he was installed as President of the Bartol Institute. From 1992 to 1999, the Bartol Institute, through a board of trustees appointed by the University, operated as a distinct entity with a salary structure, policies, procedures and administration separate from the University.

Beginning in 1997, Melvin Schiavelli, University Provost and a trustee of the Bartol Institute, initiated efforts to forge a closer relationship between the Bartol Institute and the University's Department of Physics and Astronomy. To that end, in the fall of 1999, pursuant to a resolution of its Trustees, the governance of the Bartol Institute was changed. The number of trustees were reduced from five to one, and Schiavelli was named the sole Trustee. As a result, Petitioners assert that the Bartol Institute was effectively subsumed into the University. These organizational changes, also agreed to by TFI, were memorialized in a new affiliation agreement between the University and the Bartol Institute (Affiliation Agreement).[3] Schiavelli directed Dr. Ness, as President of the Bartol Institute, to sign the Affiliation Agreement. Dr. Ness refused to do so, citing concerns that the structural and operational changes presented a conflict of interest between the objectives of the Uni-

2. The position of Director of the Bartol Research Foundation was eliminated and replaced by the President of the Bartol Institute.

3. The 2000 Affiliation Agreement also materially altered the operating policies and procedures of UD–BRI as follows:
   (a) The Sponsorship Agreement would be of no further force or effect;
   (b) The Bartol Activities would be conducted at the UD through an existing department or newly created unit;
   (c) The new UD–BRI would conduct both the Bartol Activities, consistent with the Bartol Will and Codicil, and such other activities as may be assigned by UD, in accordance with UD policies and practices;
   (d) The new UD–BRI would be managed by a director, appointed by the UD Provost, and such director would report to the Provost, or other individual within UD, as designated by the Provost;
   (e) All faculty members of the UD–BRI, on the effective date of the new agreement being July 1, 2000, would become tenured members of the UD faculty;

   (f) All direct subsidies to UD–BRI from the UD would cease and thereafter, all UD–BRI funding would come from: (i) the BRF Endowment; (ii) UD support of faculty tenured by and to UD; and (iii) contract and grant revenue generated by UD–BRI activities;
   (g) Both the BRF Endowment and the UD–BRI contract and grant revenues would be included as part of the annual budget of UD, consistent with the UD practices and procedures;
   (h) Overhead on grant and contract funding would be charged at a higher UD rate than previously employed by UD–BRI since all proposals would be submitted to sponsoring agencies via UD, and a major fraction of these increased overhead charges, 72%, would be retained by UD; and
   (i) UD–BRI would receive only 28% of the overhead charged which change would be in sharp contrast to the return of 100% of the overhead previously charged by UD–BRI.
   R.R. 31a–32a.

versity and the traditional goals of the Bartol Research Foundation and the Bartol Institute. Schiavelli removed Dr. Ness as President on May 1, 2000; however, Dr. Ness continues to teach as a professor at the Bartol Institute.

During the pendency of the aforementioned organizational changes, Dr. Pomerantz informed Dr. Ness that he was interested in making a major contribution to the Bartol Institute. In June 1999, Dr. Pomerantz donated $500,000 to endow a chair in his name at the Bartol Institute and to fund the types of research and educational activities envisioned by Henry W. Bartol.

By letter dated January 10, 2001, Appellants advised the Attorney General of the structural, operational and fiscal changes implemented by the University with respect to the Bartol Institute. Appellants requested that the Attorney General review the propriety of the University's actions under the Nonprofit Corporation Law of 1988, 15 Pa.C.S. §§ 5101–6162.[4] To date, the Attorney General's Office has taken no position in this matter.

On April 29, 2002, Appellants filed a Petition for Citation and Petition for Review with the trial court pursuant to Section 5793 of the Nonprofit Corporation Law of 1988. Appellants averred that the corporate actions taken by Respondents in effecting changes in the governance of the Bartol Research Foundation and the Bartol Institute, and in restructuring the Bartol Institute's relationship with the University were improper, failed to comply with statutory procedures, and created a conflict of interest. Appellants requested an accounting of all funds transferred from the Bartol Research Foundation to the Bartol Institute or to the University, alleging that said funds were not used in accordance with the original intent of the Bartol will. Appellants sought reimbursement from the University and TFI for all expenses they incurred in this action, as well as a return of Dr. Pomerantz's $500,000 donation, plus interest. The trial court issued citations against the named Respondents as well as the Attorney General as *parens patriae*.

Respondents filed preliminary objections claiming that Appellants lacked standing to assert any claims on behalf of the Bartol Institute. A conference was held on October 8, 2002, at which time Appellants conceded that an evidentiary hearing was unnecessary. Following oral argument, the trial court entered a decree sustaining the preliminary objections and dismissing Appellants' petition. Appellants filed exceptions, which were denied. On June 30, 2003 the trial court affirmed its decree by final order and filed an opinion sur exceptions. This timely appeal followed, in which Appellants argue that the trial court erred in concluding that Appellants lacked standing.[5]

---

4. Specifically, Appellants queried "whether the actions taken constitute (i) improper actions by interested directors in the sudden reduction in number and nature of the Board of Trustees of UD–BRI to one, being the Provost of the University such that a conflict of interest has developed; and/or (ii) the failure of [UD] and TFI to comply with the statutory procedures applicable to fundamental changes in a nonprofit corporation, such as merger, consolidation or transfer of corporate assets." R.R. 124a.

5. In their statement of the questions involved, Appellants contend that the trial court erred in dismissing their petition for review without conducting an evidentiary hearing. However, in the body of their argument, Appellants concede that because Respondents did not raise any issues of fact in their preliminary objections, those objections "were able to be disposed of as a matter of law." Brief for Appellants at 20. Appellants also did not request an evidentiary hearing when they appeared

In an appeal from a trial court order sustaining preliminary objections and dismissing a complaint, our scope of review is to determine whether an error of law was committed, or an abuse of discretion occurred. *Muncy Creek Township Citizens Committee v. Shipman*, 132 Pa. Cmwlth. 543, 573 A.2d 662, 663 (1990). When considering the preliminary objections, we must, of course, keep in mind that they admit as true all well-pled facts and inferences reasonably deducible therefrom, but not conclusions of law. *Keranko v. Washington Youth Baseball, Inc.*, 136 Pa.Cmwlth. 709, 584 A.2d 1082, 1084 (1990).

Appellants filed their petition for review of a contested corporate action under Section 5793 of the Nonprofit Corporation Law of 1988,[6] which provides as follows:

(a) **General rule.**—Upon petition of any person whose status as, or whose rights or duties as, a member, director, member of an other body, officer *or otherwise* of a nonprofit corporation are or may be affected by any corporate action, the court may hear and determine the validity of such corporate action.

15 Pa.C.S. § 5793 (footnote omitted) (emphasis added). Appellants do not assert standing as directors or officers of the Bartol Institute; rather, they contend that they fall within the ambit of the phrase "or otherwise" and thus enjoy a "special relationship" with the Bartol Institute.

This Court considered a similar standing argument in *Keranko v. Washington Youth Baseball, Inc.*, 136 Pa.Cmwlth. 709, 584 A.2d 1082 (1990). In that case, Matthew Keranko and his father brought suit against a nonprofit corporation which operated a youth baseball league, challenging the league's failure to select Matthew for its all-star team. In rejecting the Kerankos' claim that they had standing under Section 5793, we explained:

Under the doctrine of *ejusdem generis* when general expressions are used in a statute they are restricted to "things and persons similar to those specifically enumerated in the language preceding the general expressions." *Summit House Condominium v. Commonwealth*, 514 Pa. 221, 227, 523 A.2d 333, 336 (1987) (quoting *Butler Fair and Agricultural Association v. Butler School District*, 389 Pa. 169, 178, 132 A.2d 214, 219 (1957)). Here, the words preceding

---

for oral argument on Respondents' preliminary objections.

6. The present case must be distinguished from cases where members of the public have sought to amend, or to preserve from change, the terms of a charitable trust established by private persons. *See, e.g., Wiegand v. Barnes Foundation*, 374 Pa. 149, 97 A.2d 81 (1953) (editor of the Philadelphia Inquirer sought to increase the hours of public access to the Barnes Foundation's art gallery); *Valley Forge Historical Society v. Washington Memorial Chapel*, 493 Pa. 491, 426 A.2d 1123 (1981) (Society sought to continue its right to occupy the chapel). Although the claims raised by Appellants herein are conceptually similar, and directed toward nonprofit entities governed by "trustees," the fact remains that the Bartol will did not create a "trust" in

the technical sense. Appellants' claims, which on their face relate to contested actions of nonprofit corporations, were properly asserted under 15 Pa.C.S. § 5793. Whether Appellants had standing to assert those claims is discussed more fully in the remainder of this opinion. We note that this Court has exclusive jurisdiction of appeals from final orders in certain private corporation matters arising under Title 15, such as the case *sub judice "relating to corporations not-for-profit ... or where is drawn in question the application, interpretation or enforcement of any provision of the ... Constitution of Pennsylvania or any statute, regulating in any such case the corporate affairs of any corporation not-for-profit subject to Title 15 ...".* 42 Pa. C.S. § 762(a)(5) (emphasis added).

"otherwise" pertain to individuals who have a special relationship to the corporation by virtue of being a member, officer or member of another body. None of these categories is even remotely similar to the Kerankos' situation. They are best described as persons totally foreign to the corporation who may have been injured by its actions.

*Id.* at 1084.

Although not directly analogous, the *Keranko* analysis is nevertheless instructive. Neither Appellant is currently a trustee of the Bartol Institute, nor do they currently hold a position enumerated in the Bartol Institute's by-laws or any other corporate document. While Dr. Ness is currently employed as a professor at the Bartol Institute, this position does not confer upon him any special rights or responsibilities that would allow him to bring the present litigation under Section 5793. Dr. Pomerantz is no longer employed by any of the named Respondents and was not a party to either the Sponsorship Agreement or the Affiliation Agreement that led to the challenged organizational changes. Nor does Dr. Pomerantz's endowment contribution confer additional rights upon him with regard to his standing in this action. As the trial court observed, "[Appellants] may feel a 'special relationship' with [the Bartol Institute] and [Bartol Research Foundation] but this does not translate into a legal relationship with the right to bring a cause of action." Opinion Sur Exceptions, at 4.

Appellants' reliance on *White v. Associates in Counseling and Child Guidance, Inc.,* 767 A.2d 638 (Pa.Cmwlth.2001) is misplaced. In that case, Mary L. White was terminated from her position as Director of Administration, a position provided for in the nonprofit corporation's by-laws and appointed by its board of directors. White sought to nullify actions taken at two board meetings and to be reinstated as Director of Administration. The issue on appeal was similar to that which we consider in the present case: whether White had standing under the "or otherwise" provision of Section 5793 to initiate a suit to compel corporate action.

Applying *Keranko,* this Court determined that White fell within the ambit of the phrase "or otherwise," and therefore had standing to sue, because she enjoyed a "special relationship" with her employer.[7] Our order, however, carefully delineated the scope of White's standing: "Mary White has standing to pursue an action pursuant to [Section 5793(a)] seeking to challenge *action of the corporation affecting her status, rights and duties as Director of Administration."* *Id.* at 644 (emphasis added). The relief sought by White was qualitatively different from the claims asserted by Appellants herein, which in our view are akin to a derivative action against Respondents on behalf of UD–BRI. As noted in *White,* "a derivative suit against corporate officials seeking to assert the rights of the corporation is not the same as White's action under Section 5793(a) seeking to enforce her own rights." *Id.* at 643. The same holds true here. If Appellants were seeking to enforce their own individual rights, then they would likely have standing to do so under Section 5793(a). They do not, however, have standing under that section to assert their present claims on behalf of the Bartol Institute.[8]

---

7. Crucial to our determination was the fact that White was appointed by a board resolution that specified the duties of her position in great detail. *White,* 767 A.2d at 642.

8. We note that the relief sought by Appellants is contemplated by an entirely different section of the Nonprofit Corporation Law of 1988: 15 Pa.C.S. § 5782 (derivative actions

Based upon the foregoing analysis, we agree with the trial court's determination that Appellants lacked standing to initiate the present action under Section 5793(a) of the Nonprofit Corporation Law of 1988. The trial court properly sustained Respondents' preliminary objection on that ground.

### *ORDER*

AND NOW, this 7th day of April, 2004, the order of the Orphans' Court Division of the Court of Common Pleas of Philadelphia County, entered June 30, 2003 in the above-captioned matter, is hereby affirmed.

against directors, members of another body and officers).