**FIRETREE, LTD., Appellant**

v.

**Russ FAIRCHILD.**

Commonwealth Court of Pennsylvania.

Argued Dec. 11, 2006.

Decided March 9, 2007.

Reargument Denied En Banc May 9, 2007.

---

Daniel F. Schranghamer, Williamsport, for appellant.

Cynthia Ranck Person, Williamsport, for appellee.

BEFORE: COLINS, President Judge and McGINLEY, Judge, and LEAVITT, Judge.

OPINION BY Judge LEAVITT.

Firetree, Ltd. appeals the dismissal of its tort claim against Representative Russ Fairchild by the Court of Common Pleas of the 17th Judicial District (Union County Branch) (trial court). The trial court held that the public statements made by Representative Fairchild about the impending sale of Commonwealth property to Firetree were protected by the Speech and Debate Clause of the Pennsylvania Constitution and, therefore, not actionable. In this case, we consider whether Representative Fairchild's conduct, designed to prevent the Commonwealth's sale of land to Firetree, was legitimate legislative activity and, therefore, immunized against an action for damages.

Laurelton Center was established in 1913 for the rehabilitation, care and treatment of persons with mental retardation. The center consists of a campus of over 342 acres in Union County with 52 buildings, including dormitories, a hospital, housing for employees, a laundry, auditorium and numerous buildings required for the maintenance of the facility, such as boiler plants and water treatment facilities. The buildings were constructed between 1913 and 1969 although most were built between 1920 and 1940. The Commonwealth closed Laurelton Center in 1998, and it has remained vacant ever since.

In 1997, the General Assembly passed a statute authorizing and directing the Department of General Services (Department) to sell the three tracts of land that comprise Laurelton Center. Act of December 19, 1997, P.L. 623, No. 66 (Act 66). Complaint, ¶¶ 15, 16. Act 66 directed the Department to sell Laurelton Center by using any of the following means: a sealed bid, an auction or a request for proposal.[1] Complaint, ¶ 16; Exhibit B; Reproduced Record at 56a–57a (R.R. __). On at least two occasions, Representative Fairchild voted in favor of Act 66. Complaint, ¶ 20.

Consistent with its authorization under Act 66, the Department decided to use a sealed bid process as the way to sell Laurelton Center. Accordingly, in August of 2004, the Department solicited sealed bids from persons interested in acquiring Laurelton Center. On October 14, 2004, Firetree submitted a bid in the amount of $883,000; the next closest bid was $10,000. On November 12, 2004, the Department sent a letter to Firetree confirming that it had been selected as a

[1]. In the event a request for proposal was the process chosen to sell Laurelton Center, the Department was required to consider such factors as job creation, expansion of the tax base, economic growth and community development. Exhibit B to Complaint; R.R. 57a.

"preferred bidder for the above-referenced property." Complaint ¶ 40. The letter also expressed confidence that there would be a "successful closing on the property" and promised that the Department would "be in touch with you shortly to discuss further steps." Complaint ¶ 41. On November 17, 2004, the Department cashed Firetree's certified check in the amount of $88,300, which had been submitted as part of its sealed bid. The Department advised Firetree that the signing of the contract was a "mere formality," but that mere formality never occurred. Complaint ¶ 43. Instead, the Department sought a commitment from Firetree that the property would be held and used by one of its for-profit affiliates. Complaint ¶ 56. The contract was never executed, and the Department refused to transfer Laurelton Center to Firetree. The complaint alleges that the refusal of the Department to convey Laurelton Center to Firetree was caused by Representative Fairchild.

The gravamen of Firetree's complaint is the allegation that Representative Fairchild prevailed upon the Department to "rescind" its contract with Firetree. Complaint ¶ 72. He did so by identifying Woodward Corporation as his preferred purchaser (Complaint ¶ 73); by describing the putative contract between the Department and Firetree as illegal (Complaint ¶ 78); and by advertising the availability of Laurelton Center in both newspapers and on his website (Complaint ¶ 80).

On June 1, 2005, Firetree initiated litigation (1) against the Department for breach of contract and (2) against Representative Fairchild for tortious interference with contractual and prospective contractual relations by filing its "First Amended Complaint" in this Court. On November 3, 2005, this Court transferred Counts IV and V, i.e., the tort claims against Representative Fairchild, to the trial court, and it transferred the remaining counts, i.e., the contract claims, to the Board of Claims.[2] On April 27, 2006, the trial court considered the outstanding preliminary objections filed by Representative Fairchild to strike the tort counts on the grounds of legislative immunity, sovereign immunity and official immunity.[3] Representative Fairchild also demurred to the complaint because it failed to allege the existence of an actual contract between the Department and Firetree, the threshold, he claimed, to a tortious interference claim.

Concluding that Representative Fairchild's alleged conduct was privileged under the Speech and Debate Clause of the Pennsylvania Constitution, the trial court found that Firetree failed to state a cause of action upon which relief could be granted. The complaint was dismissed. Firetree then appealed to this Court.

On appeal, Firetree raises four issues.[4] First, it contends that the trial

---

**2.** The Board of Claims ultimately dismissed Firetree's breach of contract action against the Department. Firetree's appeal from the Board of Claims' order is the subject of a companion case, which resulted in a published opinion filed simultaneously with this opinion. *Firetree, Ltd. v. Department of General Services*, 920 A.2d 906 (Pa.Cmwlth., No. 1036 C.D.2006, filed March 9, 2007).

**3.** It is not clear to the Court why Representative Fairchild filed a motion to strike instead of a demurrer to the tort counts in the First

Amended Complaint. The trial court treated the motion to strike as a demurrer.

**4.** Our scope of review on appeal from an order sustaining preliminary objections and dismissing a complaint is to determine whether the trial court committed legal error. *In re Estate of Bartol*, 846 A.2d 209, 213 (Pa. Cmwlth.2004). When considering preliminary objections, we must accept as true all well-pled facts set forth in the complaint, as well as all inferences reasonably deducible therefrom, but not conclusions of law. *Id.*

court relied on facts not contained in the complaint. Second, it contends that the trial court's inferences from the facts stated in the complaint were unreasonable. Third, it contends that a representative in the General Assembly does not enjoy immunity under the Speech and Debate Clause of the Pennsylvania Constitution with respect to a claim of tortious interference with a contract for the sale of Commonwealth land. Fourth, Firetree contends that it was not legitimate legislative activity for a member of the General Assembly to criticize the Department and thereby prevent consummation of a transaction negotiated between Firetree and the Department. For purposes of our analysis, we will treat the first two issues as one, and the second two issues as one.

█ We turn, first, to Firetree's contention that the trial court erred in relying on "assumed" facts that were not stated in the complaint. In considering a demurrer, a court is limited to the facts in the pleading. Nevertheless, documents attached to a complaint, and facts stated in those documents, may be considered to sustain a demurrer. *Detweiler v. School Dist. of Borough of Hatfield,* 376 Pa. 555, 558, 104 A.2d 110, 113 (1954).

Firetree challenges five sentences in the trial court's opinion, which Firetree argues go beyond the facts pled in the First Amended Complaint. The sentences so challenged state as follows:

1. The Laurelton Center having been in existence since 1913 in all likelihood employed a significant portion of the citizenry of Union County and thus impacted, in some measure, the economic growth of the county.

2. We can also assume, without knowing any specifics except for those facts averred of record, that the facility's closure and its ultimate disposition brings to bear socio-economic ramifications for the citizenry of Laurelton and neighboring communities.

3. Laurelton and neighboring communities—many of whom, in all likelihood, comprise the constituency of Representative Fairchild.

4. Given the potential impact of the final disposition of the Laurelton Center on the residents of Union County, Representative Fairchild's insinuation into that process must be viewed as an expected exercise of his legislative prerogative....

5. We must assume that his constituents expect him to serve in that capacity which one can reasonably assume will entail voicing support or opposition to legislation affecting the socio-economic futures of constituents.

Trial Court 4/27/06 Opinion, at 5–6. Firetree asserts that in making its determination to dismiss its complaint, the trial court was not free to make "assumptions" or posit how "in all likelihood" the closing of Laurelton Center affected the citizenry and the economy of Union County, part of which lies in Representative Fairchild's district. Representative Fairchild responds that all of the above-listed facts can be related directly to, or by reasonable inference from, the complaint or the exhibits attached to the complaint.

The First Amended Complaint presented a very detailed description of Laurelton Center, its history, and its impact on the

Preliminary objections in the nature of a demurrer should be sustained only where the pleadings are clearly insufficient to establish a right to relief; any doubt must be resolved in favor of overruling the demurrer. *Jacobs v. Merrymead Farm, Inc.,* 799 A.2d 980, 983 (Pa.Cmwlth.2002).

Union County economy. In addition, the exhibits attached to the complaint describe Laurelton Center, the reasons for its sale and the objectives of the sale, *i.e.*, the future use. These exhibits are incorporated by reference into the First Amended Complaint. *See, e.g.*, Complaint, ¶ 21.

Exhibit "A," which is the "Invitation to Bid Instructions," provides numerous details about Laurelton Center. It states, in relevant part, as follows:

The disposition of the Property has the following objectives:

Reduce the Fiscal Burden Imposed on State and Local Taxpayers

The property is surplus to the State's needs, and maintenance of this surplus property is an unnecessary burden for the State and its citizens. *The sale will put this surplus property back on the local real estate tax rolls.*

Encourage Economic Development

The Property was once a *major source of local employment.* The *sale of the Property will provide an opportunity for significant private sector investment and job creation.*

Increase Local Control

The purchased Property will be *subject to local zoning and land use laws, regulations, ordinances and procedures and local real estate taxes.*

R.R. 32a (emphasis added). With respect to Zoning, Exhibit "A" further stated that:

Bidders should consult with *local zoning and land use authorities* regarding *permitted uses and development* of the Property. The purchased Property will be *subject to local zoning and land use laws, regulations, ordinances and procedures.*

R.R. 35a (emphasis added). Finally, Exhibit "C," the "Property Information Package" provided a comprehensive market analysis with detailed information about Laurelton Center, Union County demographics, the Union County economy and employment statistics.

The facts that appear in the above-listed statements by the trial court in its opinion can be directly related to what is stated in the First Amended Complaint and in the Exhibits attached thereto. Further, Firetree misapprehends the trial court's intent in using such phrases as "in all likelihood" or "we can only assume." These were choices of style used not to state fact but to explain reasoning. The word "logically" could have been used in these sentences without changing the meaning of the sentence. Style is not a basis for reversing the trial court's decision. In sum, the trial court's legal analysis was based upon the facts presented in the First Amended Complaint or the Exhibits attached thereto, as is required in any demurrer.

Next, we consider Firetree's claim that the trial court erred in dismissing the tort counts in the complaint on the basis of Speech and Debate Clause immunity. The trial court found that Representative Fairchild's conduct constituted legitimate legislative activity and, as such, was immunized against either of Firetree's tort theories: *i.e.*, interference with contractual relations and interference with prospective contractual relations.[5]

 The actions of Representative Fairchild challenged by Firetree are his various expressions of opposition to the sale of Laurelton Center to Firetree. Stated otherwise, the actions challenged

---

**5.** Because we hold in the companion case that there was no contract, as a practical matter, the only tort claim remaining is the alleged interference with prospective contractual relations. *See Firetree, Ltd. v. Department of General Services*, 920 A.2d 906, 909 (Pa. Cmwlth., No. 1036 C.D.2006, filed March 9, 2007).

by Firetree consisted of speech, and speech has First Amendment implications. Under the Noerr–Pennington doctrine, an individual is immune from liability for exercising his or her First Amendment right to petition the government. *See E.R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 137–140, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961) and *United Mine Workers v. Pennington,* 381 U.S. 657, 669–670, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Indeed, the Supreme Court has explained the doctrine as extending protection to an absolute right that does not depend on whether the speaker has a proper motive or intent. *Noerr*, 365 U.S. at 139, 81 S.Ct. 523. The doctrine applies with equal force to government officials in the act of petitioning or lobbying other governmental bodies. *See, e.g., Manistee Town Center v. City of Glendale,* 227 F.3d 1090, 1092–1094 (9th Cir.2000) (claim against City of Glendale dismissed on basis of Noerr–Pennington where the city was sued for lobbying the county not to rent space in a shopping center owned by plaintiff). Under the Noerr–Pennington doctrine, Representative Fairchild had an absolute right, as a citizen or as a legislator, to petition the executive branch to stop a proposed sale of Commonwealth property, and his motive for doing so is irrelevant. He may have done so because he believed the land should be preserved as public land; that a higher price should be extracted from the putative purchaser; or that it should be developed in a different way than intended by Firetree. It matters not. The heart of Firetree's claim is

that Representative Fairchild prevailed upon the Department not to close the deal. This was his right.

However, Representative Fairchild did not raise his First Amendment privilege as a defense but, rather, demurred on grounds of legislative immunity. Accordingly, it is on that basis that we must determine whether the trial court erred in dismissing Firetree's complaint.

■ We turn, then, to the issue of legislative immunity. Elected members of the Pennsylvania General Assembly are entitled to the privileges and immunities set forth in the "Speech and Debate Clause" of the Pennsylvania Constitution. It states:

> The members of the General Assembly shall in all cases, except treason, felony, violation of their oath of office, and breach of surety of the peace, be privileged from arrest during their attendance at the sessions of their respective Houses and in going to and returning from the same; and for any speech or debate in either House they shall not be questioned in any other place.

PA. CONST. ART. 2, § 15. This constitutional provision protects legislators from judicial interference with their "legitimate legislative activities," and any civil or criminal suit brought against a legislator for an action falling within the "legitimate legislative sphere" must be dismissed. *Consumers Education and Protective Association v. Nolan,* 470 Pa. 372, 382, 368 A.2d 675, 681 (1977).[6] Our Supreme Court has ex-

---

**6.** The United States Supreme Court explained the reason for conferring immunity on elected legislators this way:

> The reason for the privilege is clear. It was well summarized by James Wilson, an influential member of the Committee of Detail which was responsible for the provision in the Federal Constitution. "In order to enable and encourage a representative of the

public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense."
*Tenney v. Brandhove,* 341 U.S. 367, 373, 71 S.Ct. 783, 95 L.Ed. 1019 (1951).

plained the breadth of the immunity as follows:

> The immunity of the legislators must be *absolute* as to their actions within the "legitimate legislative sphere." To accomplish this we must not only insulate the legislator against the results of litigation brought against him for acts in the discharge of the responsibilities of his office, but also relieve him of the responsibility of defending against such claims.

*Consumer Party of Pennsylvania v. Commonwealth,* 510 Pa. 158, 174, 507 A.2d 323, 331 (1986), *abrogated on other grounds by Pennsylvanians Against Gambling Expansion Fund, Inc. v. Commonwealth,* 583 Pa. 275, 877 A.2d 383 (2005) (citing *Hutchinson v. Proxmire,* 443 U.S. 111, 123, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979)) (emphasis added).

 Legitimate legislative activity extends beyond floor debate on proposed legislation, and it is not confined to conduct that actually occurs in the State Capitol building. *See, e.g., Harristown Development Corp. v. Department of General Services,* 135 Pa.Cmwlth. 177, 580 A.2d 1174 (1990), *reversed on other grounds,* 532 Pa. 45, 614 A.2d 1128 (1992) (holding that a state senator was legislatively immune from a suit in connection with his requests for information from a nonprofit corporation); *Melvin v. Doe,* 48 D. & C. 4th 566 (C.P.Allegh.2000) (quashing the subpoena of a state senator to attend and testify at a deposition about his activities in filling a judicial vacancy). In determining what constitutes legitimate legislative activity, it is appropriate to follow federal cases interpreting the Speech and Debate Clause in the United States Constitution. *Nolan,* 470 Pa. at 382, 368 A.2d at 680

(holding there is no basis for distinguishing the scope of the Speech and Debate Clause in the Pennsylvania Constitution from that in the United States Constitution).

The United States Supreme Court has held that legislative immunity "attaches to all actions taken 'in the sphere of legitimate legislative activity'" and that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott–Harris,* 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998).[7] The United States Court of Appeals for the Third Circuit has expressed the test for determining what constitutes "legislative activity" as follows:

> First, *the act must be "substantively" legislative, i.e., legislative* in character. Legislative acts are those which involve policy-making decision [sic] of a general scope or, to put it another way, legislation involves line-drawing. Where the decision affects a small number or a single individual, the legislative power is not implicated, and the act takes on the nature of administration. *In addition, the act must be "procedurally" legislative,* that is, passed by means of established legislative procedures. This principle requires that constitutionally accepted procedures of enacting the legislation must be followed in order to assure that the act is a legitimate, reasoned decision representing the will of the people which the governing body has been chosen to serve.

*Gallas v. Supreme Court of Pennsylvania,* 211 F.3d 760, 774 (3d Cir.2000) (emphasis added).

---

7. The Pennsylvania Supreme Court uses the same terminology, noting that the inquiry in a legislative immunity case is whether a particular act falls within the "legitimate legislative sphere." *Nolan,* 470 Pa. at 382, 368 A.2d at 681.

Representative Fairchild is a member of the General Assembly, and as such, he is entitled and obligated to seek input from constituents about their concerns; such concerns lie at the core of proposed legislation. Indeed, "[n]othing is more basic to the independence and integrity of the legislature than its ability to pass legislation." *Consumer Party*, 510 Pa. at 173, 507 A.2d at 330. The trial court found that talking to constituents and others was a "core" legislative function, a holding consistent with that in *DeSimone, Inc. v. Philadelphia Authority for Industrial Development*, 2003 WL 21390632 (C.P.Phila.2003) (by Judge Cohen), as Representative Fairchild notes.

*DeSimone, Inc.* concerned the lease of a tract of land owned by the City of Philadelphia. DeSimone's proposal to lease the tract was opposed by City Councilman Brian O'Neill, and DeSimone sought injunctive relief and damages from Councilman O'Neill for his alleged tortious interference with contractual relations. In granting Councilman O'Neill's motion for summary judgment, the court of common pleas held that

> this Court finds that the umbrella of legislative immunity extends to protect elected officials from civil suits for intentional interference with contractual relations, *where, as here, the facts demonstrate that the official is acting on behalf of his constituency.*

*Id.* at *6 (emphasis added). The facts in *DeSimone, Inc.* are very close to the facts of this case, and, thus, Representative Fairchild urges this Court to follow its persuasive logic.

 Firetree, however, contends that acting on behalf of constituents is not the essence of legitimate legislative activity, directing us to *United States v. Brewster*, 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972). In *Brewster*, the U.S. Supreme Court held that the Speech and Debate Clause did not immunize a former U.S. Senator from a criminal indictment for bribery. In reaching this conclusion, the Supreme Court observed that members of Congress engage in numerous activities, such as assisting constituents in procuring government contracts and giving speeches, that are "political" rather than legislative activities. The Supreme Court noted that "it has never been seriously contended that these political matters, however appropriate, have the protection afforded by the Speech and Debate Clause." *Id.* at 512, 92 S.Ct. 2531. Firetree contends that Representative Fairchild's actions constituted political activities on behalf of constituents and, as such, are not protected by the Speech and Debate Clause. There are two flaws with Firetree's position.

First, the holding in *Brewster* was that the Speech and Debate Clause "does not prohibit inquiry into activities that are casually or incidentally related to legislative affairs but not a part of the legislative process itself." *Brewster*, 408 U.S. at 528, 92 S.Ct. 2531. Stated otherwise, *Brewster* drew the line between "ancillary" and central legislative activity. Pennsylvania follows this rule; ancillary activities are not protected. *See, e.g., Hamilton v. Hennessey*, 783 A.2d 852 (Pa.Cmwlth.2001) (Speech and Debate Clause does not preclude discovery regarding whether newsletters were "campaign expenses" under Election Code); *McNaughton v. McNaughton*, 2005 WL 2834243 (C.P. Dauphin 2005) (in divorce case, no protection as to discovery of husband's House calendar and checking account).

Second, Firetree does not explain why making inquiries about a transfer of public land in his district was "political" as opposed to legislative, particularly in light of the fact that the conveyance of the Commonwealth land in question here, Laurel-

ton Center, required an act of the General Assembly. Ultimately, Act 66, the statute under which Firetree submitted a bid, was repealed. New legislation authorized the Department to convey Laurelton Center to "Mountain Valley, Inc., a Maryland Corporation, for consideration equal to fair market value, as determined by independent appraisal." Act of July 5, 2005, P.L. 60, No. 23 (Act 23).

The line between "ancillary" and "legitimate" is somewhat difficult to draw. Nevertheless, we conclude that Representative Fairchild's actions, which consisted of speech about Laurelton Center, fell within the ambit of legitimate legislative activity. Indeed, the bidding process for the sale of Laurelton Center, on which Firetree bases its claim, only began because of the passage of Act 66. Any law passed by the General Assembly can also be repealed. The actions of Representative Fairchild related to the repeal of Act 66 and to the adoption of Act 23. It must, therefore, be considered to fall within the sphere of "legitimate" legislative activity.

For these reasons, we affirm the trial court.

### ORDER

AND NOW, this 9th day of March, 2007, the order of the Court of Common Pleas of the 17th Judicial District (Union County Branch) dated April 27, 2006, in the above captioned matter is hereby AFFIRMED.